(216 P.3d 710)

No. 101,852

STATE OF KANSAS, *Appellant*, v. EDDIE J. PETERMAN, *Appellee*.

Opinion filed September 25, 2009.

*Scott E. McPherson*, county attorney, and *Steve Six*, attorney general, for the appellant.

*Charles A. O'Hara*, of O'Hara & O'Hara, of Wichita, for the appellee.

Before McANANY, P.J., PIERRON and LEBEN, JJ.

PIERRON, J.: The State of Kansas appeals the district court's suppression ruling in its case against Eddie J. Peterman. We reverse and remand for trial.

On October 30, 2007, Rice County Sheriff's Deputy Brian Treaster was dispatched to perform a "civil standby" at Peterman's residence. Treaster understood a civil standby to mean "to keep the peace." Upon arriving at Peterman's house, Treaster met Debra Nelson, who was coming out of the residence. Nelson informed Treaster that Peterman was inside the residence, he was upset with her, and he wanted her to leave. According to Treaster's testimony, Nelson stated that "she would just like for me to come keep an eye, make sure she could get the rest of her items." Treaster's report provided that Nelson said she wanted "an officer to stand by while she received [*sic*] her last few items."

Nelson entered the residence, and Deputy Treaster followed her inside. Although Nelson did not explicitly ask Treaster to come inside the residence, Treaster believed Nelson wanted him to do so because "[t]hat's where the problem was." Upon Treaster's entry

into the home, Peterman came around the corner carrying an assault-type rifle. Peterman pointed the rifle directly at Treaster and stated, " 'Get the fuck out of my house.' " Treaster put his hands in the air and told Peterman to stop. Peterman walked closer to Treaster, lifting the rifle up at an angle and repeated, " '[G]et the fuck out of my house.' " Treaster then left the house, fearing he might be shot.

Peterman was subsequently charged with one count of aggravated assault of a law enforcement officer, contrary to K.S.A. 21-3411. Officers removed a .308 caliber rifle and a magazine from Peterman's home. Following a preliminary hearing, Peterman was bound over for trial. Prior to trial, Peterman moved to suppress evidence of the assault, alleging that because Treaster lacked permission to enter the residence and none of the exceptions to the search warrant requirement applied, Treaster's entry into the residence was illegal. Following argument on the matter, the district court granted Peterman's motion. The judge stated, in relevant part:

"[Y]ou have someone, an officer, just called to stand by. Not to stand by inside the house, just to simply stand by. And from you telling me that the facts are undisputed that he was not invited by the person who owned the residence, the defendant, and not the person who called to come into the house, the officer had no right to walk into somebody's house, and I don't care if he thinks he has a duty to make sure that nothing happens to the party who called, as long as he is there to stand by and is not invited to come into the house, he cannot go into somebody's residence . . . . If there was an emergency occurring when he is standing by . . . he can stand right outside the door and wait for somebody to ask him to come in or to call or if there is a commotion inside . . . then the officer has a duty to go ahead and go in and prevent a crime [from being] committed. But in this particular case, as I see it, the crime developed when he walked into the house because he was not asked to come into the house. In fact, he was asked to leave the house and he did not do that . . . and that's when the circumstances . . . that developed into this. So I'm going to grant the motion."

The State contends on appeal that the district court erred in granting Peterman's motion to suppress. Specifically, the State claims that when Deputy Treaster entered Peterman's residence, he was performing a community caretaking function and was motivated by public safety concerns because he had reasonable

grounds to believe that Nelson had an immediate need for assistance to protect her life or property.

The parties stipulated to the facts presented at the preliminary hearing. When the material facts to a trial court's decision on a motion to suppress evidence are not in dispute, the question of whether to suppress is a question of law over which an appellate court has unlimited review. *State v. Porting*, 281 Kan. 320, 324, 130 P.3d 1173 (2006). The State bears the burden of proof on a suppression motion. *State v. Ibarra*, 282 Kan. 530, 533, 147 P.3d 842 (2006).

The Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights generally prohibit the warrantless entry of a person's home. *Payton v. New York*, 445 U.S. 573, 576, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980); *State v. Mendez*, 275 Kan. 412, 420-21, 66 P.3d 811 (2003). "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion. [Citations omitted]." See *Silverman v. United States*, 365 U.S. 505, 511, 5 L. Ed. 2d 734, 81 S. Ct. 679 (1961). Absent exigency or consent, warrantless entries into a home are per se unreasonable. See *Steagald v. United States*, 451 U.S. 204, 211, 68 L. Ed. 2d 38, 101 S. Ct. 1642 (1981); *State v. Thompson*, 284 Kan. 763, 776, 166 P.3d 1015 (2007) (listing exceptions to the search warrant requirement).

In granting Peterman's motion to suppress, the district court found that because Treaster was not explicitly invited inside the residence by either Nelson or Peterman, and because there was no emergency, Treaster had no right to enter the residence.

The State relies on the emergency doctrine and public safety rationale to justify Deputy Treaster's entry into the home, arguing that it was reasonable for him to do so because he was concerned for Nelson's safety.

However, Deputy Treaster's entry into the home cannot be justified on these bases. Under the emergency doctrine, the police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for assistance for the protection of life or property. There must also be some reasonable basis, ap-

proximating probable cause, to associate the emergency with the area or place to be searched. *State v. Geraghty*, 38 Kan. App. 2d 114, 123-24, 163 P.3d 350, *rev. denied* 285 Kan. 1175 (2007). Under the public safety rationale for car stops, there must be specific and articulable facts from which a law enforcement officer " 'would suspect that a citizen is in need of help or is in peril.' " *State v. Gonzales*, 36 Kan. App. 2d 446, 456, 141 P.3d 501 (2006). The reasonableness of the officer's belief of the existence of an emergency and an immediate need for assistance is measured by an objective standard. *State v. Horn*, 278 Kan. 24, 32-33, 91 P.3d 517 (2004).

The facts of the present case are unlike those in other cases where courts have found either the emergency doctrine or the public safety rationale applies. See, *e.g.*, *State v. Drennan*, 278 Kan. 704, 719-21, 101 P.3d 1218 (2004) (finding reasonable grounds to believe there was an emergency when the officers were aware there was a prior history of domestic violence between the defendant and his girlfriend; a 911 caller heard an argument, a woman's scream, and then silence; and the defendant was agitated and refused to tell officers responding to the 911 call whether his girlfriend was inside the apartment); *Gonzales*, 36 Kan. App. 2d at 453-54 (upholding a public safety stop where officer observed a bouncing rear tire and an open hatch over the fuel cap).

Here, there is no objectively reasonable basis to conclude that Deputy Treaster's entry into the residence was necessary in order to save lives or property. The circumstances known to Treaster at the time of entry were that Peterman was inside the house, was angry, and wanted Nelson to leave. Treaster did not testify that he thought Nelson was in danger, and there is no indication that Treaster knew Peterman had a weapon inside the house. Thus, the emergency doctrine and/or the public safety rationale cannot be used to justify Treaster's entry into the home. See *Mendez*, 275 Kan. at 428-29 (finding officers' warrantless entry into defendant's apartment did not fall under the emergency doctrine exception to the warrant requirement because there was no indication that anyone inside the apartment needed emergency assistance).

Other state and federal courts that have considered similar situations—where a defendant sought to suppress evidence relating to his or her violence or threatened violence toward police officers subsequent to an unlawful search or seizure or a warrantless entry—have generally held that evidence of a separate, independent crime initiated against police officers in their presence after an illegal entry or arrest will not be suppressed under the Fourth Amendment. *E.g.*, see *United States v. Waupekenay*, 973 F.2d 1533, 1537-38 (10th Cir. 1992) ("'On occasion, when the police conduct an illegal arrest or an illegal search, this will prompt the person arrested or subjected to the search to react by committing some criminal offense. He might attack the officer, attempt to bribe him, or make some criminal misrepresentation in an effort to bring the incident to a close. . . . In cases where the response has been a physical attack upon the officer making the illegal arrest or search, courts have . . . held that the evidence of this new crime is admissible.'") (quoting 1 LaFave & Israel, Criminal Procedure § 9.4(f), pp. 759-60 [1984]).

In *Waupekenay*, police unlawfully entered the defendant's home in response to a domestic violence complaint. Upon their entry, the defendant aimed a semi-automatic rifle at the officers. The defendant was subsequently arrested and charged with assault with a dangerous weapon. The defendant moved to suppress evidence obtained as a result of the officers' entry, and the trial court granted the motion, holding that the entry was illegal. The Tenth Circuit Court of Appeals reversed the trial court, finding that although the officers had entered the home illegally, the defendant could not have had a reasonable expectation of privacy once he was aware that the officers were inside his home. 973 F.2d at 1536-38.

The *Waupekenay* court noted that courts have used different rationales when considering the admissibility of evidence involving separate and independent crimes initiated against police officers in their presence after an illegal entry:

"Some courts have found the intervening act of the defendant to be so separate and distinct from the illegal entry or arrest as to break the causal chain. [Citations omitted.]

"Other courts have stressed the limited objective of the exclusionary rule—*i.e.*, deterring unlawful police conduct by excluding evidence obtained as a result of such conduct—and the strong public interest in preventing and punishing force or threats of force directed against police officers. [Citations omitted.]" 973 F.2d at 1538.

See *State v. Bale*, 267 N.W.2d 730, 733 (Minn. 1978) (holding that the assault committed by defendant was "an intervening act of defendant's free will which dissipated any taint" caused by unlawful police behavior); *State v. Burger*, 55 Or. App. 712, 716, 639 P.2d 706 (1982) ("We decline to hold that after an unlawful entry evidence of subsequent crimes committed against police officers must be suppressed. Such a rule would produce intolerable results. For example, a person who correctly believed that his home had been unlawfully entered into by police could respond with unlimited force and, under the exclusionary rule, could be effectively immunized from criminal responsibility for any action taken after that entry. . . . We do not believe either the state or federal constitution compels such a result.").

Peterman continued to brandish the rifle after he was aware that Deputy Treaster was in his home. Therefore, we could rely on any of the three rationales discussed above. We could find that Peterman's conduct was an intervening act of free will that was separate and distinct from Treaster's alleged illegal entry or that Peterman had no reasonable expectation of privacy in committing the assault against Treaster because he was aware that the deputy was inside his home. Additionally, we could rely on the limited objective of the exclusionary rule and the strong public interest in preventing and punishing force or threats of force directed against law enforcement. "[W]hatever rationale is used, the result is the same: Evidence of a separate, independent crime initiated against police officers in their presence after an illegal entry or arrest will not be suppressed under the Fourth Amendment." *Waupekenay*, 973 F.2d at 1538.

Regardless of whether Treaster had consent to enter the home, the trier of fact should be allowed to determine whether Peterman's actions were reasonable. See *State v. Aydelotte*, 35 Wash. App. 125, 133-34, 665 P.2d 443 (1983) ("[Defendant]'s response

to the police intrusion, if reasonable, may provide a defense to the charges against him. . . . This is for the trier of fact to determine, however, not for the trial court deciding a pretrial motion to suppress."). The district court's order granting Peterman's motion to suppress must be reversed.

We make no rulings considering other possible justifications for the officer's actions.

We reverse and remand with directions that the charge of aggravated assault of a law enforcement officer be reinstated against Peterman.