NOT DESIGNATED FOR PUBLICATION

No. 118,792

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CAMERON MICHAEL TAYLOR,
*Appellant*.


MEMORANDUM OPINION

Appeal from Finney District Court; RICKLIN PIERCE, judge. Opinion filed October 30, 2020. Affirmed in part, reversed in part, vacated in part, and remanded with directions.

*Kasper Schirer*, of Kansas Appellate Defender Office, for appellant.

*William C. Votypka*, deputy county attorney, *Susan Lynn Hillier Richmeier*, county attorney, and *Derek Schmidt*, attorney general, for appellee.


Before MALONE, P.J., ATCHESON and SCHROEDER, JJ.


ATCHESON, J.:  A jury sitting in Finney County District Court found Defendant Cameron Michael Taylor guilty of battery against a law enforcement officer, intentional criminal threat, and possession of marijuana—all felony charges. We reverse the marijuana conviction because the district court erred in denying Taylor's motion to suppress the drugs as the product of an unconstitutional search and seizure. In turn, the admission of the marijuana as evidence at trial was impermissibly prejudicial to Taylor on the possession charge. We do not find Taylor's other claims of error sufficient to reverse the remaining convictions, so we affirm them and the resulting sentences. We

affirm in part, reverse in part, and remand to the district court with directions to both suppress the marijuana and to grant Taylor a new trial on the possession charge.

DENIAL OF MOTION TO SUPPRESS

*A. Marijuana*

We begin with Taylor's motion to suppress the marijuana as a product of a police detention violating his rights secured in the Fourth Amendment to the United States Constitution to be free from unreasonable government searches and seizures. In reviewing the district court's denial of that motion, we look at the evidence presented at the hearing on the motion and at the preliminary hearing, since the parties agreed to the admission of that testimony, as well. Taylor submitted that Garden City Police Officer Richard Colburn had no valid reason to stop him as he walked down a street in that city in the middle of the afternoon. The State countered that the officer had ample grounds to detain and then search Taylor, resulting in the discovery of the marijuana.

Colburn provided the only relevant testimony describing the stop. Taylor testified at neither the suppression hearing nor the preliminary hearing. The district court appears to have credited Colburn's factual account, so we proceed accordingly. In reviewing a ruling on a motion to suppress, we apply a bifurcated standard. We give deference to the district court's findings of fact so long as they have support in the evidence; we then make an independent determination of whether those findings justify the district court's legal conclusion. *State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016); *State v. Woolverton*, 284 Kan. 59, 70, 159 P.3d 985 (2007). The State bears the burden of proving by a preponderance of the evidence that a search or seizure conforms to the Fourth Amendment. *Patterson*, 304 Kan. at 272; *State v. Pollman*, 286 Kan. 881, 886, 190 P.3d 234 (2008).

2

Colburn was on routine patrol in the middle of the afternoon on April 26, 2017, when he saw Taylor walking down the street in what has been characterized as a mostly residential area of Garden City. According to Colburn, Taylor did nothing to suggest he had just committed a crime or was preparing to do so. Colburn saw nothing to indicate Taylor was carrying a handgun, illegal drugs, or other contraband. So Taylor did not appear to be in the process of committing a crime.

But Colburn testified the neighborhood was a "high drug area," and police had made two arrests for firearms and illegal drugs there in the preceding two weeks. Colburn said he had "located firearms in that area" and had "located narcotics in that . . . particular block." In addition, Colburn explained that at the police roll call the day before, a detective announced that Taylor had been seen with a handgun and an unspecified amount of methamphetamine. At the suppression hearing, Colburn agreed there were no active warrants for Taylor's arrest.

Colburn testified that he had "prior knowledge of" Taylor that included an understanding he was a "narcotics trafficker" and a member of a particular street gang. Another officer had told Colburn that Taylor was skilled in martial arts. And Colburn alluded without detail to Taylor's previous interactions with law enforcement. Throughout the record in this case, there are veiled references to an incident several years earlier that led to Taylor being charged with multiple counts of battery against a law enforcement officer. A jury apparently found him not guilty in early 2015.

Colburn said he decided to stop Taylor because of the roll call bulletin from the day before and the character of the neighborhood as a drug trafficking locale. As Colburn described the encounter, he pulled his patrol car alongside Taylor, got out, and declared, "Cameron, come over here." When Colburn spoke, Taylor began backing away and made "furtive movements" with his hands around the waistband of his pants—actions Colburn considered to be consistent with Taylor having a handgun. Colburn testified that he did

3

not consider Taylor free to leave and told him he was being "detained." He also said he was concerned for his own safety if Taylor had a handgun.

At the preliminary hearing, Colburn testified he ordered Taylor to face away from him with his hands raised above his head. Taylor complied and asked what he had done wrong. By then, Colburn had requested a backup officer and told Taylor to wait until another officer arrived so he could do a pat-down for weapons. According to Colburn, Taylor denied having a gun. At the suppression hearing, Colburn testified that he ordered Taylor to turn around, to get on his knees, and to place his hands on the back of his head.

After Officer Jairo Armenta arrived, Colburn did a pat-down search of Taylor and felt something consistent with marijuana in a plastic bag in a pocket of Taylor's pants. Colburn then handcuffed Taylor and removed what was, indeed, marijuana from the pocket. Taylor, however, had no handgun or other weapons. Because Taylor had a previous conviction for possession of marijuana, he was charged with felony possession in this case. We pause our narrative of the events to consider the search and seizure issues bearing on the discovery of the marijuana.

The Fourth Amendment prohibits government agents, including law enforcement officers, from conducting unreasonable searches and seizures of persons or their effects. For Fourth Amendment purposes, the courts have identified four general categories or types of interaction between law enforcement officers and citizens:  voluntary encounters; investigatory or *Terry* stops; arrests; and public safety contacts. *State v. Cleverly*, 305 Kan. 598, Syl. ¶ 4, 385 P.3d 512 (2016).

Taylor contends there was nothing voluntary about his interaction with Colburn and the officer had insufficient grounds for an investigatory detention and search. The State argues that Colburn and Taylor engaged in a voluntary encounter that morphed into a constitutionally sufficient investigatory detention when Colburn ordered Taylor either

4

to turn around and raise his hands or to kneel and place his hands behind his head, followed by an equally permissible search. The State's argument partially aligns with the district court's ruling in denying the motion to suppress. As we explain, however, both the State and the district court have offered constitutionally untenable analyses. Our discussion focuses on the hallmarks of voluntary encounters and investigatory detentions.

Neither the parties nor the district court analyzed the stop as an arrest. A constitutionally proper arrest requires the arresting officer to have either probable cause to conclude the person detained has committed a crime or a reasonable belief the person is the subject of a valid warrant. Since probable cause is a higher standard than reasonable suspicion, a seizure that cannot be factually justified as a *Terry* stop or investigative detention necessarily fails as a constitutionally proper arrest. Nobody has suggested this was a public safety contact—a species of interaction between government agents and citizens quite different from investigatory detentions or arrests—in which a law enforcement officer acts not in service of a criminal investigation but on an objectively reasonable belief a person may be in peril. See *State v. Messner*, 55 Kan. App. 2d 630, 635, 419 P.3d 642 (2018).

A voluntary encounter, as the phrase suggests, entails a law enforcement officer approaching a person and initiating a conversation with the individual absent any legal grounds to detain him or her or to otherwise compel any cooperation. Accordingly, the individual freely may choose to stay and respond or may simply walk away. See *Florida v. Bostick*, 501 U.S. 429, 434-35, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991); *State v. McKeown*, 249 Kan. 506, 509-10, 819 P.2d 644 (1991). The parameters of the interaction are legally no different from two private citizens meeting by chance in a public place— either may disregard the other at no more than the cost of appearing rude. See *City of Topeka v. Grabauskas*, 33 Kan. App. 2d 210, 219, 99 P.3d 1125 (2004) (Fourth Amendment voluntary encounter preserves right of citizen to refuse to answer questions and to leave). Concomitantly, a law enforcement officer rebuffed during a voluntary

5

encounter *cannot* treat the citizen's lack of cooperation as an indicator of criminality warranting an investigatory stop or some other involuntary detention. *McKeown*, 249 Kan. at 509-10; *Grabauskas*, 33 Kan. App. 2d at 219; see also *Florida v. Royer*, 460 U.S. 491, 497-98, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983) (plurality opinion) (citizen's "refusal to listen or answer" during a voluntary encounter does not "furnish those grounds" justifying a constitutionally permissible seizure or detention). If the law were otherwise, the encounter couldn't be truly voluntary, since the citizen participant would incur a material legal detriment for choosing to disengage.

In an investigatory detention or *Terry* stop, law enforcement officers may halt and briefly question a person if they have a reasonable suspicion based on articulable facts that the individual has just committed, is committing, or may be about to commit a crime. *Arizona v. Johnson*, 555 U.S. 323, 326-27, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009); *Adams v. Williams*, 407 U.S. 143, 145-46, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972); *Terry v. Ohio*, 392 U.S. 1, 21-23, 30, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). The suspicion of criminal involvement cannot rest on mere hunches or speculation, but an officer may rely on training and experience to deduce nefarious implications from circumstances that those outside the law enforcement field might view as entirely innocuous. See *Terry*, 392 U.S. at 22-23, 27; *State v. Martinez*, 296 Kan. 482, Syl. ¶ 4, 293 P.3d 718 (2013) (district court erred in finding that an experienced officer with a hunch possessed a reasonable suspicion of wrongdoing); accord *Brown v. Texas*, 443 U.S. 47, 52 n.2, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979). Reasonable suspicion doesn't conform to a concise definition or a precise quantification, but it is less demanding than probable cause and far less so than a preponderance of the evidence. To be reasonable, however, the suspicion must be supported by at least some objective facts indicating criminal involvement on the part of the person stopped. *State v. Jones*, 47 Kan. App. 2d 866, 872, 280 P.3d 824 (2012), *aff'd* 300 Kan. 630, 333 P.3d 886 (2014). Having made an otherwise proper investigatory detention, a law enforcement officer may conduct a limited pat-down search of the person being detained based on a reasonable, factually anchored suspicion the person has a

6

dangerous weapon and may pose a threat. *Johnson*, 555 U.S. at 326-27 (investigatory *Terry* stop may entail frisk or pat-down search for weapons if officer reasonably suspects individual may be armed and dangerous); *Terry*, 392 U.S. at 27, 29-30; *State v. White*, 44 Kan. App. 2d 960, 970-71, 241 P.3d 591 (2010).

Based on the totality of the circumstances, there was no voluntary encounter between Colburn and Taylor. Colburn stopped his patrol car, got out, and ordered Taylor over to him. Not to put too fine a point on it, that's not voluntary. A reasonable person would not feel free to walk away from a fully uniformed, armed law enforcement officer making a specific command to that person to come to the officer. See *State v. Guein*, 309 Kan. 1245, 1255-56, 444 P.3d 340 (2019). The dynamic is both factually and legally more oppressive than an officer simply walking up to a person on the street and asking neutral, nonaccusatory questions. An officer exerts a degree of dominion and control with a command requiring a person to move in a particular manner or to a particular place that undoes a sense of choice about compliance and substitutes something approaching compulsion. 309 Kan. at 1255-56 (reasonable persons would view encounters as involuntary when "officers *immediately* exert their authority. . . without advising [persons they are] free to leave"); *State v. Epperson*, 237 Kan. 707, 713-14, 703 P.2d 761 (1985) (Two individuals were seized or detained for Fourth Amendment purposes when a law enforcement officer told them to "[w]ait" or "[w]ait a minute" as they were walking away from their lawfully parked car, and the officer immediately began questioning them about why they were there.).

Colburn's detention or seizure of Taylor would have been constitutionally permissible at the outset if it were a proper investigatory or *Terry* stop. But Colburn had no articulable factual basis to suspect Taylor of immediate criminal conduct as he walked down the street. Colburn testified that he saw nothing to indicate Taylor had just committed a crime, was in the process of committing a crime, or was about to commit a crime—the circumstances justifying an investigatory stop. Taylor's presence in what

7

Colburn described as an area with a high incidence of drug trafficking did not justify an investigatory stop, even assuming the description was accurate. See *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000) ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."); *State v. Anguiano*, 37 Kan. App. 2d 202, 207, 151 P.3d 857 (2007) (same).

The roll call report from the detective the day before didn't provide Colburn with a sufficient constitutional basis to stop Taylor or to continue to detain him. The State, however, suggests the report should be considered under what's called the collective-knowledge doctrine. Through the collective-knowledge doctrine, one officer may rely on information or directives to act received from other officers, so their aggregate understanding of the circumstances may furnish the reasonable suspicion for an investigatory detention or probable cause for an arrest. See *State v. Miller*, 49 Kan. App. 2d 491, 496-97, 308 P.3d 24 (2013) (outlining collective-knowledge doctrine); see also *State v. Niblock*, 230 Kan. 156, 161, 631 P.2d 661 (1981) (recognizing doctrine without describing its contours). The officer acting on the shared knowledge or the directive need not be familiar with details of the imparted information or independently verify its reliability. But the totality of the information must be constitutionally sufficient to justify the action taken. *Miller*, 49 Kan. App. 2d at 497.

Here, however, the roll call report fails in at least two respects. First, it lacked the immediacy to support an investigatory detention. The report itself was 24 hours old, and the State never established when the detective received the underlying information that Taylor purportedly had been in possession of methamphetamine and a handgun. So the information was too remote to support an investigative detention.

Second, nothing in the record established the origin of the information about Taylor and, thus, its reliability. Even under the collective-knowledge doctrine, the joint

8

reconnaissance must come from reliable sources to justify a constitutionally valid seizure. *Frimmel Management v. United States*, 897 F.3d 1045, 1052 (9th Cir. 2018) (for Fourth Amendment purposes, source of information must be trustworthy and have obtained information in demonstrably reliable way); Grossman, *Whither Reasonableness: The Supreme Court's Functional Abandonment of the Reasonableness Requirement for Fourth Amendment Seizures*, 53 Am. Crim. L. Rev. 349, 349 (2016) ("Before information leading to probable cause or its lesser iteration of reasonable suspicion is found to exist, the government must demonstrate in some meaningful way the reliability of the person providing the information or of the information itself."). If, for example, an undercover officer bought drugs from a suspect who was carrying a handgun, that would be reliable information. Likewise, an informant's tip to a detective that he or she had just heard a named individual offering to sell large quantities of illegal drugs would be reliable if the tipster had previously supplied accurate reports of criminal activity. The record here offers no such verification of the underlying information in the roll call report.

Similarly, the record fails to show how recent the underlying information was. Even originally reliable information may cease to be so with the passage of time. Thus, a controlled buy or a tip from weeks earlier, though reliable then, would be too old to support a valid investigatory detention of a suspect simply spotted walking down the street. The law enforcement officer making the stop would lack a factual basis to reasonably infer the suspect then possessed illegal drugs or was otherwise immediately involved in some other criminal activity. See *United States v. Brookins*, 345 F.3d 231, 236 (4th Cir. 2003) (officers' observations furnishing probable cause for warrantless search of motor vehicle for drugs had not become stale in 15 minutes but would have been so two weeks later). In short, the collective-knowledge doctrine cannot elevate a constitutionally inadequate basis for a search or seizure to constitutional sufficiency simply because some of the information had been transmitted from one government agent to another.

When Colburn saw Taylor walking down the street, nothing about Taylor's appearance or conduct cued Colburn that, in the words of *Terry*, "criminal activity may be afoot." 392 U.S. at 30. Colburn, therefore, had no reasonable basis compatible with the Fourth Amendment to detain Taylor. In sum, Colburn unconstitutionally seized Taylor.

In its ruling, the district court described Colburn as "detaining" Taylor when he got out of the patrol car and sought to question him. The district court explained that Colburn "should have let him go" but for Taylor's evasive and "furtive gestures" prompting his continued detention for a pat-down search. The district court correctly concluded Colburn seized Taylor for Fourth Amendment purposes at the outset of their contact, meaning there never was a voluntary encounter. The district court found Colburn both objectively and subjectively believed Taylor had a handgun and his belief supported a pat-down for weapons.

The flaw in the district court's reasoning lies in its failure to identify a constitutional basis for the *Terry* stop or detention of Taylor. As we have explained, the record does not support one. And the State has attempted to avert that deficiency with its similarly flawed argument that the contact began as a voluntary encounter. But a law enforcement officer can search a person for weapons only if the detention itself comports with the Fourth Amendment as an investigatory stop or a valid arrest. See *Terry*, 392 U.S. at 30. In other words, a *Terry* pat-down must be ancillary to a constitutionally proper investigatory detention. See *Johnson*, 555 U.S. 326-27; *United States v. Green*, 946 F.3d 433, 439 (8th Cir. 2019); cf. *State v. Bannon*, 306 Kan. 886, 892, 398 P.3d 846 (2017) (constitutionally valid "stop and frisk" under *Terry* requires officer "reasonably suspect" both immediate criminal activity and person detained to be "armed and presently dangerous"). If the detention itself violates the Fourth Amendment, the pat-down cannot be independently justified as a constitutionally reasonable search.[1]

[1]A law enforcement officer could make a full body search—not just a pat-down—of a suspect arrested on probable cause or a warrant. *Arizona v. Gant*, 556 U.S. 332, 339, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009); *United States v. Robinson*, 414 U.S. 218, 235, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973). Likewise, an officer could pat down a person during a voluntarily encounter if the person freely and clearly consented. *State v. Lee*, 283 Kan. 771, 777-78, 156 P.3d 1284 (2007). This case fits within neither of those scenarios.

In conclusion, Colburn's pat-down search, yielding the marijuana, flowed directly and really inextricably from his unconstitutional seizure of Taylor. There was no causal break or intervening event attenuating the seizure and the search. See *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). The district court should have granted Colburn's motion to suppress the marijuana as evidence against him. Without belaboring the obvious, the State's introduction of the marijuana during the trial, therefore, was error, and it prejudicially compromised Taylor's right to a fair hearing in front of the jury on the marijuana charge.

We, therefore, reverse Taylor's marijuana conviction, vacate that sentence, and remand to the district court with directions to grant Taylor's motion to suppress the marijuana and to conduct any further proceedings consistent with our ruling.

*B. Evidence of Battery Against a Law Enforcement Officer and Criminal Threat*

Taylor argued in the district court and again on appeal that testimony and other evidence supporting the charges of battery against a law enforcement officer and making a criminal threat should be suppressed because the circumstances followed his unconstitutional detention on the street. Although we have found Colburn violated Taylor's Fourth Amendment rights in seizing him, we do not find his argument on this point constitutionally sound.

11

We pick up our narrative account of the events of April 26, 2017, to supply the relevant facts. For purposes of this issue, we rely on the officers' account of what happened—again because Taylor did not testify at the suppression hearing or the preliminary hearing. Colburn arrested Taylor after he did the pat-down, handcuffed Taylor, and extracted the marijuana. Colburn and Armenta then walked Taylor in the direction of Armenta's patrol car to transport him to jail. According to the officers' later testimony, Taylor became obstreperous and demanded they "'show some respect.'" Taylor then began to physically resist and broke free from Colburn, turned toward Armenta, and headbutted him. Armenta testified the blow split his lip and he cut his finger trying to subdue Taylor. The officers regained control of Taylor and put him in Armenta's patrol car.

When Taylor and Armenta arrived at the jail, Taylor continually stared intently at Armenta in a way the officers described as "confrontational" and even belligerent. A sergeant at the jail told Taylor to knock it off. Taylor continued what he knew by that point to be provocative behavior and told Armenta, "I'll be seeing you." At trial, Armenta testified that those words caused him to fear for his safety.

The State charged Taylor with battery against a law enforcement officer, a severity level 7 person felony violation of K.S.A. 2016 Supp. 21-5413(c)(2)(B), based on the headbutt of Armenta, and with criminal threat, a severity level 9 person felony violation of K.S.A. 2016 Supp. 21-5415(a)(1), based on the statement to Armenta in the jail.

Taylor's theory for suppressing the officers' testimony and other evidence of the battery and the threat rests on two legal flaws: first, a misapplication of *Wong Sun* and the fruit of the poisonous tree doctrine drawn from that decision; and second, an overextension of the exclusionary rule as a remedy for Fourth Amendment violations. The exclusionary rule requires suppression of evidence government agents obtain in violation of a criminal defendant's Fourth Amendment rights, meaning that evidence

12

cannot be used to convict the defendant. *United States v. Leon*, 468 U.S. 897, 908-09, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984) ("The Court has, to be sure, not seriously questioned, 'in the absence of a more efficacious sanction, the continued application of the rule to suppress evidence from the [prosecution's] case where a Fourth Amendment violation has been substantial and deliberate.'"). Courts continue to view the exclusionary rule as the most effective way to deter Fourth Amendment violations on the theory that law enforcement officers will avoid unconstitutional conduct precisely because the government will be deprived of the resulting inculpatory evidence in prosecuting accused criminals. In other words, law enforcement officers will strive to comply with the Fourth Amendment to avoid the exclusion of otherwise damning evidence of criminal wrongdoing. See *Herring v. United States*, 555 U.S. 135, 139-40, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009) (The exclusionary rule is "'designed to safeguard Fourth Amendment rights generally through its deterrent effect.'") (quoting *United States v. Calandra*, 414 U.S. 338, 348, 94 S. Ct. 613, 38 L. Ed. 2d 561 [1974]).

The exclusionary rule, however, can exact a substantial cost in any given case and may thwart the successful prosecution of a guilty defendant. See *Hudson v. Michigan*, 547 U.S. 586, 592, 126 S. Ct. 2159, 165 L. Ed. 2d 56 (2006). The relief typically accrues to defendants who aren't especially deserving based on their own conduct; they benefit as a byproduct of exacting a punitive price from transgressing government agents to induce better conduct from them in the future. Accordingly, the evidence suppressed ought to have a comparatively tight nexus or legally recognized connection to the Fourth Amendment violation. *United States v. Mosley*, 743 F.3d 1317, 1323 (10th Cir. 2014); *United States v. Kornegay*, 410 F.3d 89, 93-94 (1st Cir. 2005). That's where the fruit of the poisonous tree doctrine comes in.[2]

[2]The exclusionary rule provides no direct relief to innocent individuals after government agents violate their Fourth Amendment rights. Those unconstitutional searches and seizures yield no incriminating evidence to suppress precisely because the individuals are innocent. In theory, however, the exclusionary rule should deter

13

government agents from violating the Fourth Amendment in the first place—heading off most illegal searches and seizures before they happen.

To apply the doctrine, a court must determine whether government agents have secured evidence "'by exploitation of'" the violation of the defendant's Fourth Amendment rights—typically requiring suppression of the fruit (the derivative evidence) of the poisonous tree (the impermissible search or seizure)—or whether the evidence was "'purged of the primary taint'" of that violation—typically permitting its use at trial. *Wong Sun*, 371 U.S. at 488; see *Utah v. Strieff*, 579 U.S. ___, 136 S. Ct. 2056, 2061, 195 L. Ed. 2d 400 (2016) (recognizing doctrine as calling for suppression of evidence "derivative" of Fourth Amendment violation). So if the challenged evidence is sufficiently purged of the Fourth Amendment violation or, in legal parlance, "attenuated" from the violation, it may be used against the defendant. See *Brown v. Illinois*, 422 U.S. 590, 603-04, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975); *Wong Sun*, 371 U.S. at 487-88; *State v. Williams*, 297 Kan. 370, 381-82, 300 P.3d 1072 (2013). As with much else in Fourth Amendment law, an attenuation analysis depends upon the totality of the circumstances. But three factors typically take center stage: (1) the lapse of time between the Fourth Amendment violation and the acquisition of the challenged evidence; (2) material intervening circumstances proximately separating the violation from the acquisition; and (3) the purpose and flagrancy of the official misconduct. *Brown*, 422 U.S. at 603-04; *Williams*, 297 Kan. at 381.

Particularly pertinent here, the fruit of the poisonous tree doctrine rejects but-for causation as too sweeping a basis to suppress evidence for a Fourth Amendment violation. *Hudson*, 547 U.S. at 592. That is, evidence should not be suppressed simply because it comes to light or arises in some fashion following or "but for" a government agent's unconstitutional search or seizure. Suppression should be ordered when it serves "the interest protected by the constitutional guarantee that has been violated." 547 U.S. at 593.

14

Those principles necessarily negate Taylor's argument for suppressing evidence of his own actions in a criminal prosecution for those actions simply because they immediately followed an unconstitutional seizure and search. Taylor's own intentional acts that are, at the very least, arguably criminal amount to the sort of intervening circumstance that would attenuate the preceding Fourth Amendment violation from evidence regarding or arising from those acts. So, for example, if a law enforcement officer arrests a person without probable cause and the person flees, the officer may pursue and arrest the person for obstruction. See K.S.A. 2019 Supp. 21-5904(a)(3) (crime of interference with law enforcement includes "knowingly obstructing, resisting, or opposing" a law enforcement officer in discharge of duties). The law enforcement officer may then constitutionally search the person incident to the second arrest even though the initial arrest violated the Fourth Amendment. See *United States v. Bailey*, 691 F.2d 1009, 1018-19 (11th Cir. 1982). And the person may be charged with obstruction. To reiterate, a person's criminal conduct typically entails a compelling intervening circumstance driving the attenuation analysis of a Fourth Amendment violation and overriding the fruit of the poisonous tree doctrine.

And it follows that the criminal conduct itself should not be suppressed as fruit of the poisonous tree. Here, Taylor's purported criminal conduct was not the result of the officers directly exploiting the initial and unconstitutional detention in some way—in contrast to the search of his pockets. Rather, the Fourth Amendment violation and Taylor's later actions have no more than a but-for causal relationship, and that is insufficient to suppress them or evidence of them under the exclusionary rule.

More broadly, the expansive exclusionary rule for which Taylor advocates far exceeds the necessary and sensible deterrent function of such a rule. As this case illustrates, the rule would insulate from prosecution defendants who intentionally attack government agents during a detention violating the Fourth Amendment. Most cases

15

would be difficult or impossible to prosecute without the officers' testimony and evidence from in-car or body video cameras. In his briefing, Taylor advances a categorical rule for suppression. So his position comes with no outer boundaries and apparently would require suppression even when an unconstitutionally detained person then uses deadly force against government agents. That is plainly not the sort of tailored deterrent remedy the United States Supreme Court has historically crafted or now endorses for Fourth Amendment violations.

Courts considering comparable arguments have been consistently unswayed. See *State v. Peterman*, 42 Kan. App. 2d 761, 765-66, 216 P.3d 710 (2009); *United States v. Sprinkle*, 106 F.3d 613, 618-20 (4th Cir. 1997); *United States v. Waupekenay*, 973 F.2d 1533, 1537-38 (10th Cir. 1992); *Commonwealth v. Mock*, 54 Mass. App. Ct. 276, 284-85, 764 N.E.2d 924 (2002); *State v. Lorenzo*, 358 P.3d 330, 335 (Utah Ct. App. 2015); 1 LaFave, Search and Seizure § 1.13(b) (6th ed. 2020). We join them. The district court properly declined to suppress evidence supporting the charges against Taylor for battery on a law enforcement officer and criminal threat.

ASSERTED TRIAL ERRORS

Taylor has alleged an array of trial errors that he says individually or collectively deprived him of a fair hearing in front of the jury. Before taking up those arguments, we offer an overview of the trial evidence.

During the trial, Colburn and Armenta testified essentially as we have already outlined and thus consistently with what they said in the pretrial hearings. The sergeant at the jail testified about Taylor's arrival and what he saw during the booking process. He testified that he did not hear Taylor threaten Armenta. We augment their accounts with details pertinent to the specific issues.

16

Taylor testified in his own defense and offered a starkly different version of what happened. He told the jury he was walking down the street when Colburn hailed him and told him to stop. Taylor said that when he did not, Colburn drew a handgun, pointed it at him, and ordered him to stop, saying he would "pop [your] bitch ass" if he refused to comply. According to Taylor, Colburn ordered him to his knees and directed him to put his hands behind his head. After handcuffing Taylor, Colburn kneed him in the back and asked if he "like[d] to beat up cops." Taylor explained that in January 2015 a jury found him not guilty of seven counts of battery against a law enforcement officer.

Taylor testified that when Armenta arrived, the two officers roughed him up. When he asked why, Colburn replied that they were looking for a gun. According to Taylor, he then asked why he was being arrested since he had no gun. Armenta supposedly told Taylor, "[S]hut your mouth." Taylor testified he told Colburn to instruct Armenta to show him some respect. Armenta supposedly responded that he didn't care who Taylor thought he was or what respect he thought he deserved and then punched Taylor in the face. According to Taylor, the officers threw him to the ground and held him there for about 10 minutes. According to Taylor, Armenta transported him to the jail. He told the jury nothing happened during the trip or while he was booked into jail.

Taylor testified that he did not have any marijuana when Colburn stopped him, he did not headbutt or otherwise strike Armenta, and he said nothing to Armenta when they were at the jail. At trial, Taylor submitted that the officers planted the marijuana and falsely accused him of striking and later threatening Armenta, presumably to retaliate for the case in which the jury found him not guilty of battering other law enforcement officers.

In their appellate briefs, the parties agree that the officers had various audio and video recording devices available to them during the April 26, 2017 encounter with Taylor. But none of the devices captured the interaction between Colburn and later

17

Armenta and Taylor on the street. Colburn testified that he failed to activate his audio and video recorders. Armenta's recording devices worked only intermittently, and his patrol car's video camera was pointed in the wrong direction. The trip from the street to the jail was recorded and is uneventful. At the jail, Armenta's devices cut in and out and did not capture Taylor's statement on which the criminal threat charge was based. The sergeant testified that his recording devices were inoperative that day.

*A. Orders in Limine*

Taylor contends the State violated three orders in limine the district court entered before and during the trial and, as a result, the jurors heard testimony that sufficiently compromised his right to a fair verdict on the charges. Although we agree two of the orders were violated, the violations did not rise to the level of reversible error.

A district court's order in limine precludes the parties from even raising, let alone discussing, certain topics in the jury's presence because their mere mention likely would create prejudice to one side or the other that would then be difficult to dispel. See *State v. Santos-Vega*, 299 Kan. 11, 25, 321 P.3d 1 (2014); *State v. Shadden*, 290 Kan. 803, 815-16, 235 P.3d 436 (2010). District courts typically enter orders in limine before trial on a party's motion, but they may do so during a trial. As an advance ruling on anticipated trial evidence, the order is interlocutory and subject to revision as the case progresses. *State v. Breedlove*, 295 Kan. 481, 494, 286 P.3d 1123 (2012); *State v. Adkins*, No. 102,560, 2011 WL 1196906, at *6 (Kan. App. 2011) (unpublished opinion). Because the orders exclude evidence based on undue prejudice relative to any probative value, a district court exercises broad judicial discretion in policing and remedying possible violations. Those rulings typically will be reviewed on appeal for abuse of discretion. *Breedlove*, 295 Kan. at 494; *State v. Crum*, 286 Kan. 145, 160, 184 P.3d 222 (2008); cf. *State v. Brazzle*, 311, Kan. 754, 466 P.3d 1195, 1200 (2020) (balancing prejudice and probative value of otherwise relevant evidence entrusted to district court's discretion).

18

Here, the district court entered orders precluding: (1) characterizations of the neighborhood where the officers and Taylor interacted on April 26, 2017, as being a high drug or high crime area; (2) references to more than one roll call bulletin about Taylor; and (3) any purported gang affiliation or membership of Taylor. We first set out the testimony and related trial circumstances Taylor contends violated each of those orders and then discuss the legal implications of those claims.

During the trial, the district court granted Taylor's motion in limine to preclude testimony describing the neighborhood where Colburn stopped him as a "high crime" or "high drug" area. The issue came up during Colburn's testimony. Outside the presence of the jury, the district court ordered that the neighborhood be characterized as "residential" without mention of drug trafficking or criminal activity generally. Colburn was present when the district court entered the order.

After Colburn resumed his testimony in front of the jury, the prosecutor asked an open-ended question about what happened. In the midst of his answer, Colburn appeared to be about to mention recent drug arrests or other crimes in the area. Both lawyers objected, and Taylor's lawyer immediately asked for a hearing. The district court excused the jury. Taylor moved for a mistrial, a request the district court declined. The district court, however, took the opportunity to explain directly to Colburn the limine order. The jury returned, and Colburn concluded his testimony without straying into forbidden territory about the neighborhood.

The State recalled Colburn as a rebuttal witness the next day. In resetting the scene for the events of April 26, the prosecutor directly asked Colburn what kind of neighborhood he was in when he saw Taylor. Colburn responded that it was a residential neighborhood that he considered to be "a high crime, high drug area." The answer drew an immediate objection from Taylor that the district court sustained. At the State's

19

request, the district court told the jury to disregard the characterization of the neighborhood and to consider it only as residential.

In a second order in limine, the district court precluded testimony about any roll call reports concerning Taylor apart from the one the detective made the day before Colburn stopped Taylor. During the trial, the prosecutor asked Colburn about that report, and he recounted being told Taylor possibly had been seen with a handgun and "a large amount" of methamphetamine. Taylor's lawyer lodged a hearsay objection that's not relevant to the appellate issue. The prosecutor then asked Colburn, "Was that the only roll call that you received regarding Mr. Taylor?" Colburn replied, "[N]o, sir." And the prosecutor followed up with, "When did you receive another roll call[?]" Taylor's lawyer again objected, this time based on a violation of the order in limine.

Outside the jury's presence, Taylor again moved for a mistrial. Without directly ruling on the request or finding a violation of the limine order, the district court admonished the prosecutor there would be "no more evidence" on roll call reports or statements made by other officers about Taylor.

Finally, Taylor contends Armenta violated the order in limine about gang membership during his rebuttal testimony. On cross-examination, Armenta was asked what he knew about the earlier prosecution of Taylor for multiple counts of battery against a law enforcement officer that resulted in not guilty verdicts. Armenta testified he understood the charges arose from Taylor's involvement in "an altercation with several gang members in a bar." Neither side lodged an objection to the testimony. We dispose of this claimed error without further legal analysis because the testimony did not even arguably violate the order. Based on Armenta's terse explanation, Taylor wound up in a bar fight with some gang members. That doesn't make him a gang member, and Armenta never said he was. To find a violation of the order, we (and the jury) would have to rely on an inference that gang members get into fights only with other gang members

20

(whether their own or of a rival gang). And that seems patently unreasonable, especially when it comes to bar fights. We do not consider this purported violation further.

On appeal, both Taylor and the State analyze the remaining violations under the standard governing prosecutorial error. We presume that's because the offending testimony appears to have been prompted, at least in part, by focused questions from the prosecutor tending to invite those responses. A prosecutor's impertinent or prejudicial questioning of a witness can amount to trial error. See *State v. Kleypas*, 305 Kan. 224, 322-23, 382 P.3d 373 (2016); *State v. Simmons*, 45 Kan. App. 2d 491, 496, 249 P.3d 15 (2011) ("In considering whether a prosecutor's questioning of a witness constitutes error, the appellate courts apply the same methodology used to evaluate improper statements in a closing argument."). We assume without deciding that the parties have correctly framed the errors and the governing analytical principles, since the resulting review is more favorable to Taylor than the abuse of discretion standard applicable to a district court's handling of violations of orders in limine.

The Kansas Supreme Court retooled the analysis of prosecutorial trial error in *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). Although *Sherman* dealt specifically with closing argument, the court has since applied the test to the examination of witnesses during trial. See *Kleypas*, 305 Kan. at 323-24. The analytical model first considers whether an error has occurred and then assesses any prejudice to the defendant's right to a fair trial flowing from the error. *Sherman*, 305 Kan. at 109.

If an appellate court finds the challenged trial conduct to be prosecutorial error, it measures prejudice by the test set out in *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), for a constitutional wrong. The State, as the party benefiting from the error, must demonstrate "'beyond a reasonable doubt'" that the mistake "'did not affect the outcome of the trial'" taking account of the full trial record. *Sherman*, 305 Kan. at 109 (quoting *Ward*, 292 Kan. 541, Syl. ¶ 6). That is, the appellate court must determine if the

21

error deprived the defendant of a fair trial—a constitutional protection rooted both in due process and in the right to trial itself. *Sherman*, 305 Kan. at 98, 109. The prejudice analysis in *Sherman* replaced a multifactor standard that also considered the prosecutor's bad intent or ill will—breaches of professional conduct the court has concluded can be addressed more directly in other ways. 305 Kan. at 114-15.

The district court found the violation resulting from Colburn's characterization of the neighborhood to be inadvertent and unintentional. As an appellate court, we are not in a position to substitute our assessment for that conclusion, especially since the district saw and heard the violation as it happened. Our vantage point in looking at a disembodied transcript isn't nearly so informative or nuanced. And we are not prepared to say the district court's conclusion was clearly erroneous. Colburn's testimony, nonetheless, violated the order in limine, so we turn to the matter of prejudice.

The prejudice to Taylor was two-fold. First, of course, the jurors heard Colburn's description of the area as one given to criminal activity generally and drug trafficking in particular. The jurors, then, might impermissibly infer some guilt by association of Taylor with the neighborhood. The purpose of the motion and the order in limine was to avoid just that sort of unfair prejudice. We assume the district court's admonition to the jurors to disregard Colburn's characterization had some ameliorative effect. See *State v. Mattox*, 305 Kan. 1015, 1027, 390 P.3d 514 (2017) (appellate courts presume jurors follow instructions district court gives them).

The second form of prejudice arose because Taylor's lawyer had to object in front of the jury to challenge testimony that the State should never have presented. And the situation unfolded only because the State violated an order in limine. Common wisdom teaches that jurors do not like objections and typically view them as an effort by the objecting lawyer to hide something. See Moss, *Rethinking Texas Rule of Evidence 103*, 56 Baylor L. Rev. 503, 561 (2004) ("Certainly, in criminal cases, with a citizen's freedom

on the line, a rule of evidence should not force an accused to choose between appearing to hide evidence from the jury and waiving his objections to the evidence."); Woodall, *Common Sense Principles of Civil Litigation*, 52 Am. Jur. Trials 1, § 64 (1994) ("[A]n evidentiary fuss in the presence of a jury, particularly when ongoing, gives the impression of hiding evidence from the jury or serves to reemphasize the objectionable evidence."). Courts have regularly recognized that in criminal cases a defense lawyer may make a legitimate strategic decision to forgo a valid evidentiary objection to mildly prejudicial testimony rather than appear deceptive or obstructionist in front of the jury. See *People v. Mims*, No. A147608, 2017 WL 3446606, at *8 (Cal. App. 2017) (unpublished opinion); *People v. Allen*, No. 291334, 2010 WL 3666819, at *9 (Mich. App. 2010) (unpublished opinion) ("The jurors could reasonably have thought that defendant was attempting to hide some damning evidence had an objection been raised."); *State v. Bloom*, No. 03-1537-CR, 2004 WL 744475, at *3 (Wisc. App. 2004) (unpublished opinion). Again, an order in limine aims to avoid placing a lawyer in precisely that dilemma; and it works if the other side abides by the order.

Here, the unsavory description of the neighborhood bore on the marijuana possession charge and the impermissible inference that Taylor had illegal drugs because he was in a place where drug trafficking ostensibly was common. Although the jury convicted Taylor of that charge, we do not dwell on the prejudice component of the *Sherman* analysis in assessing the issue. We have reversed Taylor's marijuana conviction based on the improper admission of the marijuana as evidence at trial and have ordered he receive a new trial on that charge. Taylor would get the same remedy for a violation of the order in limine. As a result, the issue is moot.

But Colburn's testimony about the character of the neighborhood was wholly divorced from the charges against Taylor for battery and criminal threat. We fail to see any initial or residual prejudice against Taylor on those charges. And he makes no argument to that effect.

23

Turning to the order in limine about roll call reports on Taylor, we assume the trial testimony amounted to a violation of the order, although the district court made no formal ruling one way or the other. But armed with that assumption, we discern no material prejudice to Taylor under the constitutional standard for error identified in *Sherman*. The improper testimony—a one-word answer to a single question from the prosecutor—established only that Taylor was the subject of more than one roll call report. In the overall scheme of the trial, the exchange could not have tipped the balance for the jury from not guilty to guilty. There is a respectable argument that the testimony actually advanced Taylor's theory of defense that the law enforcement officers sought to harass and frame him because he had been acquitted in the 2015 trial. That is, the department regularly circulated false reports about Taylor's possible criminal activity to set him up for precisely the sort of stop Colburn made in this case. Taylor has not shown a basis for relief because of what we have assumed to be a violation of this order in limine.

*B. Cross-Examination of Taylor*

As we have outlined, Taylor testified in his own defense and described a conspiracy among local law enforcement officers to frame him on the charges in this case. While cross-examining Taylor, the prosecutor challenged his account by asking if "this is the first time you've presented any of this information to the Court?" In context, the question appears to refer to the ostensible police setup and fabrication of evidence against Taylor. And the implication of the question is that Taylor would have come forward sooner with his account if it were true.

On appeal, Taylor argues the question amounts to an impermissible comment on his silence after being arrested and likens it to what is commonly called a *Doyle* violation. See *Doyle v. Ohio*, 426 U.S. 610, 617-19, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976) (explaining violation of defendant's due process rights); *State v. Kemble*, 291 Kan. 109,

24

121, 238 P.3d 251 (2010) (noting rule in *Doyle*). We are unpersuaded Taylor has shown the violation of a right analogous to or derivative of the protection the United States Supreme Court fashioned in *Doyle*.

A *Doyle* violation occurs when a prosecutor attempts to impeach a defendant's trial testimony by pointing out that the defendant declined to answer questions from government agents who had advised him or her of the right to remain silent and, therefore, did not provide the exculpatory account at that time. *Doyle*, 426 U.S. at 617-19. At the start of a custodial interrogation, law enforcement officers are required to inform a suspect of various constitutional protections, including the right to remain silent and to refuse to answer questions. See *Miranda v. Arizona*, 384 U.S. 436, 444-45, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); *State v. Aguirre*, 301 Kan. 950, 954, 349 P.3d 1245 (2015). In that circumstance, the government effectively invites the suspect to say nothing—an invitation that necessarily extends to any exculpatory narrative.

In its most corrosive form, a *Doyle* violation, then, entails the prosecutor cross-examining a defendant at trial about why he or she didn't disclose that version of events (or any version, for that matter) during an earlier interview with a law enforcement officer, thereby suggesting that silence demonstrates the trial testimony to be unworthy of belief. See 426 U.S. at 613-14. But, as the Court pointed out, the silence could just as likely be the product of the law enforcement officer's admonition to the defendant that he or she had the right to decline to answer questions. The Court characterized the circumstance as "insolubly ambiguous" and recognized it would be inherently unfair to burden the exercise of that fundamental right by allowing the prosecution to use the resulting silence to impeach the defendant on cross-examination or to assail his or her credibility in closing argument. 426 U.S. at 614 n.5, 617-18. The Court held doing so would violate a defendant's the Fourteenth Amendment due process rights. 426 U.S. at 619.

Here, however, the record does not show that law enforcement officers ever attempted to question Taylor or informed him of his right to remain silent. So the factual predicate for a *Doyle* violation is missing. Taylor acknowledges as much and argues that the district court's appointment of a lawyer to represent him shortly after he was charged is somehow the equivalent to law enforcement officers informing defendants of their right to remain silent. And, in turn, the prosecutor's cross-examination of Taylor about not coming forward with his account impermissibly intrudes upon that right. The argument, however, is flawed in several respects.

First, the vice of a *Doyle* violation lies in the government effectively whipsawing a defendant by inviting his or her silence through the *Miranda* warnings and then attacking him or her at trial for accepting that invitation. The appointment of a lawyer to represent an indigent defendant isn't the same in no small part because an appointed lawyer can't be likened to a government agent. The lawyer has a constitutional, ethical, and fiduciary duty of independent allegiance to the defendant and, therefore, is not a government agent even though he or she may be paid by the State.

Second, in any given case, a defense lawyer and his or her client could decide that disclosing an exculpatory version of events or some other information to the prosecutor in advance of trial might be advantageous. By the same token, however, defendants can choose to keep their accounts confidential as a matter of trial strategy. But they may be cross-examined about the resulting silence without intruding upon constitutional protections rooted in due process and the right against self-incrimination. By testifying, a defendant relinquishes the shield against self-incrimination and may be properly questioned about what he or she tells the jury as long as the questioning does not trade upon the defendant's invocation of the right to silence prompted by the State's invitation to remain silent. See *Fletcher v. Weir*, 455 U.S. 603, 606-07, 102 S. Ct. 1309, 71 L. Ed. 2d 490 (1982); *State v. Massey*, 247 Kan. 79, 82, 795 P.2d 344 (1990) (*Doyle* "stand[s] for the principle that a defendant's silence *induced by government action* cannot be used

26

to impeach his credibility"); *United States v. Wright*, 777 F.3d 769, 778 (5th Cir. 2015) ("The Court's holding in *Doyle* demonstrates that it is not the arrest and custody that trigger *Doyle* protections, but rather the assurance of *Miranda* warnings.").

Taylor asserts no alternative ground for attributing error to the prosecutor's question. We find that Taylor has shown no constitutional error emanating from *Doyle* or some other purportedly improper use of or comment on his postarrest silence.

*C. State's Closing Argument*

On appeal, Taylor contends the prosecutor committed two reversible errors during closing argument to the jury. We have already briefly set out the *Sherman* standard for prosecutorial error. In applying that test to a closing argument, an appellate court first must determine if the prosecutor's comments have exceeded the broad latitude afforded lawyers in crafting their arguments to juries and, therefore, amount to error. *Sherman*, 305 Kan. at 109 (The "wide latitude" extended prosecutors in closing argument and otherwise in presenting the State's case for conviction of a defendant must be exercised within the duty "to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial."). If the argument amounts to error, prejudice must be measured against a criminal defendant's constitutional right to a fair trial, as we have already discussed. See 305 Kan. at 98, 109.

First, Taylor cites several references by the prosecutor to Taylor's supposed testimony that Colburn drew his pistol and put it to Taylor's head, touching his hair. But Taylor actually testified that Colburn pointed the pistol at him and ordered him to kneel on the sidewalk—not that Colburn made physical contact with the handgun. Colburn, of course, denied drawing or brandishing his pistol.

Lawyers are not supposed to misstate the evidence in their closing arguments, although they may ask the jurors to draw reasonable inferences from the testimony and exhibits. *State v. Anderson*, 294 Kan. 450, 463, 276 P.3d 200 (2012). And the misstatement is error whether the lawyer acts intentionally or inadvertently. The prosecutor's comments were, therefore, error. But we fail to see any tangible prejudice flowing from the rather narrow deviation between the argument and the evidence. The overarching question for the jury rested on the credibility of Taylor's broad claim that he had been framed. Part of that included how Colburn treated him during their encounter. In Taylor's version, Colburn acted abusively by holding him at gunpoint and roughing him up. Colburn's account cast Taylor as defiant and combative. In those competing narratives, whether Colburn touched Taylor with his pistol as he brandished it is a distinction without any legal or factual significance. The error could not have influenced, let alone shaped, the jury's verdicts.

Second, in describing the evidence of Taylor's guilt to the jury, the prosecutor declared, "[W]e don't think there's any reasonable doubt." Lawyers are not permitted to express their personal opinions about the credibility of witnesses or, more generally, the overall strength of the evidence. *State v. Peppers*, 294 Kan. 377, 396, 276 P.3d 148 (2012). They may invite the jurors to reach their own reasonable conclusions about credibility or guilt based on the evidence; and as good advocates, they should guide the jurors to testimony or exhibits of particular significance. But an advocate's expression of personal opinion only muddies what is supposed to be the jurors' logical process of evaluating the evidence and finding facts. And a personal opinion is no less so because it is couched in a first-person plural or royal "we" rather than a first-person singular "I." See *State v. King*, 308 Kan. 16, 34-35, 417 P.3d 1073 (2018). Here, again, we have an instance of prosecutorial error.

But the error entailed an isolated remark during an extended closing argument. As a single statement, it appropriately might be labeled a "technical" mistake. The

28

impermissible impact on the jurors would have been somewhere between negligible and nonexistent. Taylor's claim for reversible error is empty. Moreover, even taking the two errors in combination, they did not adversely affect the fairness of the trial.

*D. Cumulative Error*

Taylor argues that even if the various errors he has identified do not individually require that he be granted a new trial, their cumulative corrosion of the process does. Appellate courts will weigh the collective impact of trial errors and may afford relief if their overall effect deprived the defendant of a fair hearing, requiring reversal of a conviction. *State v. Harris*, 310 Kan. 1026, 1041, 453 P.3d 1172 (2019); *State v. Smith-Parker*, 301 Kan. 132, 167-68, 340 P.3d 485 (2014). An appellate court examines the entire trial record to assess the aggregate effect of multiple trial errors. 301 Kan. at 167-68. The assessment takes account of "how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence." *State v. Miller*, 308 Kan. 1119, 1176, 427 P.3d 907 (2018).

We undertake that task here. We have identified two errors arising from violations of the orders in limine and two errors in the prosecutor's closing argument. Of these, the violation of the order in limine regarding how the neighborhood should (or should not) have been characterized was the most significant. As we have explained, however, it bore on the marijuana conviction that we have reversed for other reasons. The residual impact of the error on the other convictions was negligible. The violation of the other in limine order with the single reference to another roll call report about Taylor was similarly minimal. As we have just explained, the errors in the closing argument seem more technical than truly tangible and likely had no impact whatsoever on the outcome of the trial.

We are, then, left with no more than minor errors bearing on the convictions for battery and criminal threat. They remain minor in their collective effect on the trial and Taylor's right to a fair adjudicatory process. See *State v. Cruz*, 297 Kan. 1048, 1075, 307 P.3d 199 (2013) ("As we have recognized for decades, '[a] defendant is entitled to a *fair trial but not a perfect one[.]'"*) (quoting *State v. Bly*, 215 Kan. 168, 178, 523 P.2d 397 [1974]). Likewise, these were not errors that catalytically had a greater impact because one enhanced the prejudice of some or all of the others. See *Smith-Parker*, 301 Kan. at 167-68; *State v. Genzel*, No. 120,602, 2020 WL 3481499, at *12 (Kan. App. 2020) (unpublished opinion) ("errors on two fronts . . . infect[ing] the forensic evidence, and . . . the closing argument" deprived defendant of fair trial).

As we have indicated, the jurors had to give at least some credence to Taylor's claim that he had been framed to find him not guilty. After observing the officers and Taylor testify, they did not. The trial errors caused no readily discernible degradation of that specific decision-making either singularly or collectively. The claim for reversal based on cumulative error, therefore, evaporates.[3]

[3]Taylor has also argued on appeal that the district court erred in denying his motion for a new trial. But the motion simply collected errors replicating those he has raised on appeal. We have found those errors don't warrant a new trial. They weren't anymore efficacious because they were assembled in a motion presented to the district court after the verdicts. The district court's denial of the new trial motion, therefore, does not furnish an independent ground for relief on appeal.

CONCLUSION

Taylor's conviction for possession of marijuana is reversed and that sentence is vacated. That charge is remanded to the district court with directions to grant Taylor's motion to suppress as it pertains to the marijuana obtained as a result of his seizure and search. The district court should permit a new trial on the marijuana charge and take any

other action necessary to or consistent with this opinion. Taylor's remaining convictions and sentences are affirmed.

Affirmed in part, reversed in part, vacated in part, and remanded with directions.