No. 103,350

STATE OF KANSAS, *Appellee*, v. TERRAL BREEDLOVE, *Appellant*.

(286 P.3d 1123)

Opinion filed September 14, 2012.

*Lydia Krebs*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Steve Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: After this court reversed for lack of jurisdiction Terral Breedlove's convictions for murder, robbery, and assault, he was convicted of first-degree murder in a new trial, and he now appeals.

We find no reversible error in the prosecution of the new trial, and we affirm the conviction.

In order to address the issues presented in the present appeal, it is necessary to review why the first group of convictions were vacated and what evidence was presented at the second trial.

On August 12, 1995, when Breedlove was 17 years old, the murder for which he has been twice convicted took place. Then, on September 3, 1995, he committed additional crimes, all stemming from a carjacking and subsequent police chase. The juvenile court authorized prosecuting him as an adult for the September 3 crimes, and Breedlove eventually entered a guilty plea to those charges. Later, when he was 19 years old, the State charged him with crimes alleged to have occurred on August 12: felony murder, aggravated robbery, and four counts of aggravated assault. He was arraigned and tried in district court without the State receiving judicial authorization to prosecute him as an adult. A jury convicted him of those crimes in 1997, and the district court sentenced him to life imprisonment plus 52 months, to be served consecutive to the sentences for the crimes disposed of in the plea. In 1999, this court affirmed the convictions and sentences for the August 12 crimes in *State v. Breedlove*, No. 80,952, 1999 WL 509667 (Kan. 1999) (unpublished opinion).

In 2006, Breedlove filed a motion to correct an illegal sentence, alleging that the district court lacked jurisdiction over his prosecution as an adult because he was not initially charged in juvenile court and the State never obtained authorization to prosecute him as an adult.

This court agreed, holding that the convictions were void, and reversed those convictions and vacated the sentences in *State v. Breedlove*, 285 Kan. 1006, 179 P.3d 1115 (2008). The mandate issued on April 21, 2008.

On April 30, 2008, the State filed new case number 08JV0623 in juvenile court, charging Breedlove with the six counts for which he had earlier been convicted. On May 5, 2008, the State filed a motion requesting authorization for adult prosecution. On November 10, 2008, Breedlove filed a motion to dismiss the nonmurder counts based on the expiration of the statute of limitations. The

motion was heard on November 18, 2008. On February 19, 2009, the Sedgwick County Juvenile Department filed a journal entry authorizing prosecution of Breedlove as an adult. On the same date, the district court filed a journal entry arraigning Breedlove on one count of first-degree murder. On February 23, 2009, the juvenile court granted the motion to dismiss the five nonmurder counts.

Prior to his trial in district court, Breedlove filed a motion to dismiss based on speedy trial grounds. This motion was denied, and a jury trial took place on June 23-25, 2009. At the second trial, the jury heard the testimony of witnesses relating to events of August 12 and September 3, 1995.

Callie Bishop testified that she was a young teenager in 1995, and that on the night of August 12, 1995, Breedlove approached her and some friends in the driveway of a friend's house in Wichita while a Hispanic man waited at the end of the driveway. Breedlove pointed a gun at Bishop, asked the teenagers if any of them owned a car, and then walked away when they explained that they were too young to drive. Danielle Hardman and Kevin Hammond corroborated Bishop's account.

Shelly Hernandez testified that she was sitting outside her apartment in Wichita on that same night when Breedlove and a Hispanic man approached them through the parking lot. Breedlove was holding a gun, and he asked them if they had seen his car. The men left when she told them she had not.

Dawn Landsdowne worked at a Checkers grocery store in Wichita. She testified that Rigoberto Garcia returned to the store on the night of August 12 to get a refund for merchandise. She observed Breedlove and another young man hanging out around the front of the store asking people if they could get a ride. The two men asked Garcia if they could get a ride with him, and they left the store shortly after Garcia left with his refund. The testimony of Craig Wilson from the first trial was read to the jury. He was a night manager at Checkers, and he corroborated Landsdowne's testimony.

Sergeant William Stevens of the Wichita Police Department testified that he responded to a call at 11:43 in the evening and found

Garcia lying on his back by some trash dumpsters in a corner of the Checkers parking lot. Garcia was still breathing at the time, but he was not conscious. Garcia never regained consciousness, and he died around 12:45 on the afternoon of August 14. At the hospital it was determined that a bullet was lodged in Garcia's head. The testimony of Dr. Marcus Nashelsky from the first trial was read to the jury. He testified that the wound was consistent with a close-range gunshot from the back left side of the head toward the front right side. He concluded that the bullet was the cause of Garcia's death.

The testimony of Andrea Carlyle from the first trial was read to the jury. She was dating Breedlove in August 1995. When she got home from work at 5:30 on the evening of August 12, Breedlove and Israel Sosa were waiting for her. They told her they were going to get something to eat and left around 6 p.m. They did not have a car and left on foot. Breedlove returned alone to her house around 2 in the morning of August 13. He told her that Sosa and he had eaten and then gone to Checkers, where they found an old man who had been shot and whose keys were lying on the ground beside him. They picked up the keys and took his car because they needed a ride home. Breedlove then told her he had shot the man, but soon afterwards told her that "he was just kidding."

Sosa testified that he and Breedlove went walking after they ate dinner on August 12. He told the jury that Breedlove was carrying a gun and that the two of them approached some children in a driveway and some people outside an apartment. They then went to Checkers, where Sosa bought a drink. They were walking away from Checkers behind the store when Sosa watched Breedlove shoot someone. Breedlove and the victim were "wrestling" over the gun when the gun went off. Breedlove then got into the victim's car, drove over and picked up Sosa, and took him home. Sosa and his family took a vacation out of town soon afterwards; when they returned, Sosa met up with Breedlove, and the two once again set out to find a car. Sosa initially testified that they traded some crack cocaine for a car, and the police chased them down. Responding to a transcript of his previous testimony, Sosa acknowledged that he and Breedlove had carjacked the car and that Sosa was driving

when the police pursued them while Breedlove fired a shotgun out the rear window.

Alvin Mitchell testified that on September 3, 1995, he was driving in Wichita when he thought he heard two young men standing near the street ask him to stop. He initially thought it was one of his nephews. When he stopped, Breedlove approached Mitchell's car and held a gun to his head; he demanded that Mitchell give him his car, his billfold, and his shoes. With Breedlove at the wheel, he and Sosa drove off in the car, leaving Mitchell by the side of the street.

Deputy Brenda Dietzman testified that she identified and pursued Mitchell's stolen car that night, and during the pursuit two shots from a shotgun were fired at her from the car. She and other officers eventually trapped Breedlove and Sosa as they attempted to flee on foot.

Anthony Davis testified that he was involved in a conversation in jail with Breedlove and Sosa in which Breedlove stated he had killed Garcia and Breedlove urged Sosa to remain quiet about Garcia's death.

Breedlove called no witnesses and introduced no evidence in his defense. The jury found Breedlove guilty as charged. The district court sentenced him to life imprisonment. Breedlove filed a timely notice of appeal.

*Speedy Trial*

Breedlove first argues on appeal that his trial violated the requirements of the Kansas speedy trial statute, K.S.A. 22-3402 (Furse).

On April 21, 2008, this court issued the mandate in *Breedlove*, 285 Kan. 1006. The new jury trial did not commence until June 22, 2009. Prior to trial, Breedlove filed a motion to dismiss, arguing that, under K.S.A. 22-3402(4) (Furse), the State had only 90 days from April 22, 2008, to bring him to trial. The district court denied the motion to dismiss on the grounds that K.S.A. 22-3402(4) (Furse) does not apply when a conviction is reversed and vacated for want of jurisdiction.

Whether a defendant's statutory right to a speedy trial was violated is a question of law that is subject to de novo review. *State v. Montes-Mata*, 292 Kan. 367, 369, 253 P.3d 354 (2011).

K.S.A. 22-3402(1) (Furse) sets out a 90-day limit for holding a person in jail without bringing that person to trial:

"If any person charged with a crime and held in jail solely by reason thereof shall not be brought to trial *within ninety (90) days after such person's arraignment on the charge*, such person shall be entitled to be discharged from further liability to be tried for the crime charged, unless the delay shall happen as a result of the application or fault of the defendant, or a continuance shall be ordered by the court under subsection (3)." (Emphasis added.)

K.S.A. 22-3402(4) (Furse) addresses the special situation when this court *reverses* a conviction:

"*In the event* a mistrial is declared or *a conviction is reversed on appeal* to the supreme court or court of appeals, *the time limitations* provided for herein *shall commence to run from* the date the mistrial is declared or *the date the mandate of the supreme court* or court of appeals *is filed in the district court*." (Emphasis added.)

Breedlove's argument on appeal is straightforward: The statute applies to him because in his 2008 appeal this court explicitly considered the remedy and held that the appropriate relief was to reverse and vacate the convictions. See *Breedlove*, 285 Kan. at 1017. The State has the burden of bringing an accused to trial within the statutory time limitation; the defendant has no obligation to take any affirmative action to ensure that the trial takes place within the allowed time. *State v. Vaughn*, 288 Kan. 140, 144, 200 P.3d 446 (2009). The State failed to commence the trial in the present case within 90 days of the mandate, and the new conviction violated the speedy trial statute.

We are persuaded, however, that K.S.A. 22-3402(4) (Furse) does not govern Breedlove's second trial. Because the original conviction was vacated for lack of jurisdiction, this is not a retrial of the same case. The proceeding leading to the present conviction was initiated in juvenile court and led to a de novo arraignment.

The 90-day speedy trial provision sensibly begins with the new arraignment because there is no "old case" from which to begin counting the 90 days. "[T]he time limitations provided for herein"

to which K.S.A. 22-3402(4) (Furse) refers could not apply in this case until after arraignment in district court. A juvenile has neither a constitutional nor a statutory right to a right to a speedy trial in matters conducted under the Juvenile Justice Code, so the time limitations of K.S.A. 22-3402 (Furse) would have no application *before* arraignment in district court. See *In re S.A.J.*, 29 Kan. App. 2d 789, 790, 31 P.3d 320 (2001); *In re T.K.*, 11 Kan. App. 2d 632, Syl. ¶ 2, 731 P.2d 887 (1987).

Because the case began again, the speedy trial requirements did not come into play until Breedlove's arraignment. See *State v. Thomas*, 291 Kan. 676, 692, 246 P.3d 678 (2011) (calculation of time under speedy trial statute begins on date of arraignment). K.S.A. 22-3402(4) (Furse) calls for "the time limitations provided for herein" to apply, and those time limitations commence to run from the time of arraignment, which did not happen in this case until February 19, 2009. Trial began on June 23, 2009, which was 124 days after the arraignment.

Breedlove does not demonstrate that the time in excess of 90 days beyond the arraignment was the responsibility of the State. Delays resulting from requests of a defendant toll the statutory speedy trial period. *Vaughn*, 288 Kan. at 144.The appellant has the burden of preserving and designating a record that supports an appellant's claim that the speedy trial statute was or was not violated. *Vaughn*, 288 Kan. at 148; *State v. Humphrey*, 252 Kan. 6, 27-28, 845 P.2d 592 (1992) (appellant has burden of designating a record showing speedy trial violation).

K.S.A. 22-3402(4) (Furse), in the context of the entire speedy trial statute, requires only that the State commence the trial within 90 days of a valid arraignment, and Breedlove does not demonstrate that he was denied his right to a speedy trial.

## The Evidence of Other Crimes

Breedlove contends on appeal that the district court improperly allowed the State to introduce evidence showing that he engaged in criminal activity outside of the time immediate to Garcia's murder. This activity included the testimony of witnesses whom he approached on the night of the murder, displaying a gun and asking

about access to a car, testimony suggesting that Breedlove kidnapped Sosa by intimidating him into riding with him in Garcia's car, and testimony relating to the carjacking incident of September 3, 1995. Breedlove did not make specific objections to the introduction of this evidence at the time it was first put before the jury.

K.S.A. 60-404 requires a timely and specific objection to the introduction of evidence before an appellate court may reverse a verdict based on that evidence. Challenges on appeal to questions posed by a prosecutor and the responses to those questions must be preserved by a contemporaneous objection. *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009). Although the district court limited some bad-acts testimony in a pretrial ruling, Breedlove did not renew his objections to the testimony at issue here, or only objected well into the testimony. Failing to raise a timely objection forecloses appellate review. *State v. McCullough*, 293 Kan. 970, 1000, 270 P.3d 1142 (2012). The issue is therefore not properly before this court, and we decline to consider it.

## Reading Transcribed Testimony to the Jury

The district court allowed the testimony of Wilson, the store manager, and Carlyle, Breedlove's girlfriend in August 1995, to be read into the record before the jury. Statements that Sosa made at the first trial were also read into the record in an attempt to impeach his version of events regarding the September 3, 1995, carjacking. Breedlove contends that because these statements were made at a void trial, they became in effect a legal nullity, and he was consequently deprived of his constitutional right to confront witnesses against him. The State responds that Breedlove failed to make a sufficiently specific objection at trial, that the earlier trial was not void in its entirety, and that any error was harmless because the evidence at issue was cumulative and corroborative.

The method employed in presenting admissible evidence, including a reading of testimony from a prior hearing that was subject to cross-examination, is reviewed for abuse of judicial discretion. *State v. Davis*, 284 Kan. 728, 736, 163 P.3d 1224 (2007). The standard for reviewing a district court decision that a witness is unavailable to testify is also abuse of discretion. *State v. Young*, 277

Kan. 588, 597, 87 P.3d 308 (2004). When reviewing issues related to the Confrontation Clause of the Sixth Amendment to the United States Constitution, this court analyzes questions of law and applies a de novo standard of review. *State v. White*, 284 Kan. 333, 345, 161 P.3d 208 (2007).

We hold that the issue was preserved for appeal but that vacating the earlier trial did not render the sworn testimony from that trial void, did not remove the constitutional protections in place at that trial, and did not change the credibility of the testimony.

A. *Preservation*

The State filed a pretrial motion to allow it to introduce Wilson's prior trial testimony. The motion asserted that Wilson was being deployed to North Carolina in his capacity of service in the United States Air Force National Guard. Breedlove did not contest Wilson's lack of availability, but instead challenged a hearsay statement contained in the transcript. The district court found Wilson to be unavailable, allowed the transcribed testimony to be read, and noted that no contemporaneous hearsay objection was raised at the initial trial and therefore the objection was waived.

The State also filed a pretrial motion to declare Carlyle unavailable because she had suffered head injuries in a car accident several years after the first trial and those injuries had disrupted both her short-term and long-term memory. The district court conducted a hearing to determine her availability and examined her medical records. She testified at this hearing that, although she remembered that Breedlove had been her boyfriend, she was unable to remember talking with him or him being at her apartment. She also testified that she could not remember anything about Sosa. She remembered that she had testified at the earlier trial, but she could not remember what she had said. She explained that even after reading a transcript of her prior testimony she could not recall the events about which she had testified, including the fact that a man had been murdered. She informed the court that she was in a car accident in 2001, and her head went through the windshield. The court found her unavailable to testify and allowed the State to read her transcribed testimony to the jury.

Breedlove raised the objection at that time that this court had found the previous trial to be void for lack of jurisdiction and that any testimony transcribed from that trial should therefore be struck as a legal nullity. The district court overruled the objection, holding that, notwithstanding the nullity of the trial, the oaths and the cross-examinations remained valid.

Before Wilson's testimony was read to the jury, Breedlove's counsel stated to the court:

"Your Honor, again just as far as this testimony goes, I did make an earlier objection about one of the objections contained in, or I guess maybe not contained in the record, and I just again note that objection for the record at this time. And I'm sure that is clear as mud."

The court responded: "The objection you raised earlier, I recall it, and the ruling will be the same as I made prior to that. And you will be overruled, but it's noted for the record."

Before Carlyle's testimony was read to the jury, Breedlove's counsel stated to the court: "Judge, as far as this witness, or I guess with regard to this witness' testimony, I would just again note my prior objection for the record at this time." The court responded: "Duly noted and my ruling will be consistent with the one I made prior to the commencement of the trial."

Finally, during the reading of Sosa's prior testimony, Breedlove's counsel made several objections going to the scope of the impeachment and the allegedly repetitive nature of the questions.

A defendant must make a timely and specific objection in order to preserve an issue for appeal. K.S.A. 60-404; *State v. Dukes*, 290 Kan. 485, 488, 231 P.3d 558 (2010). Furthermore, the defendant may not object on one ground at trial and then argue another ground on appeal.

To be sure, the objections voiced at trial were not specific, referring only to an "earlier objection" or a "prior objection." It is clear, however, that the district court understood the basis of the objection, referring back to its earlier ruling. The pretrial objection as to the nullity of the first trial applied to any evidence read to the jury from that trial: "I would just simply make the argument that if that trial was a nullity, any of the testimony that arose during that trial would be a nullity as well . . . ."

We therefore elect to address on their merits the issues of the reading of transcribed testimony from the prior trial.

### B. *Confrontation Clause*

K.S.A. 2008 Supp. 60-460 provides for consideration by the fact-finder of testimony given in a previous trial:

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible except:

. . . .

"(c) *Depositions and prior testimony*. Subject to the same limitations and objections as though the declarant were testifying in person, . . . if the judge finds that the declarant is unavailable as a witness at the hearing, testimony given as a witness in another action . . . or former trial in the same action, . . . when (A) the testimony is offered against a party who offered it in the party's own behalf on the former occasion or against the successor in interest of such party or (B) the issue is such that the adverse party on the former occasion had the right and opportunity for cross-examination with an interest and motive similar to that which the adverse party has in the action in which the testimony is offered, but the provisions of this subsection (c) shall not apply in criminal actions if it denies to the accused the right to meet the witness face to face."

Out-of-court testimonial statements by witnesses used against the accused are barred under the Confrontation Clause of the Sixth Amendment to the United States Constitution unless the witness is unavailable and the accused had prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable by the court. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). The *Crawford* Court emphasized the importance of cross-examination: "When testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." 541 U.S. at 68.

The Sixth Amendment right of confrontation is satisfied if the accused confronted the witnesses against him or her at any stage of the proceedings and has had an opportunity of cross-examination. *State v. McCray*, 267 Kan. 339, 353, 979 P.2d 134 (1999). Breedlove was represented at his previous trial and his counsel cross-examined Wilson, Carlyle, and Sosa.

## C. *Void First Trial*

Vacating a judgment does not undo history and make it so that the proceeding never occurred or was defective in every respect. If a witness had perjured himself or herself at the first trial, that perjury would not have been undone by the subsequent finding that the trial was void. See K.S.A. 21-3805(a)(1) (crime of perjury includes testifying to any material fact upon oath before any entity authorized to administer oaths). Similarly, counsel and witnesses from the first trial are not required to return fees paid for their appearances at a proceeding where the judgment was subsequently vacated.

In *Roche v. Lang*, No. B 114622, 2010 WL 779782, at *4 (2010), an unpublished opinion of the California Court of Appeal filed March 9, 2010, the court noted that testimony from a void judgment may be used in a later proceeding:

"The default judgment was erased after the trial court found that Lang was not properly served with the summons and complaint. The judgment is void ab initio, and we cannot consider it for any purpose. *The only use Roch can make of the default prove-up hearing is the transcript of his sworn testimony.*" (Emphasis added.)

In *People v. Graham*, 43 A.D.2d 182, 350 N.Y.S.2d 458 (1973), the court considered a case in which the defendant succeeded in having a murder conviction reversed through federal habeas corpus relief. The state court deemed the reversal a "voiding" of his conviction, but nevertheless allowed transcripts of witnesses from his earlier trial to be read into evidence because those witnesses were no longer available.

We agree with those decisions. The testimony given in the first trial was presented with all statutory and constitutional protections in place. Breedlove's Sixth Amendment right to confront the witnesses against him was satisfied at the first trial. There was no connection between the testimony of those witnesses and the grounds for vacating the conviction. It is undisputed that those witnesses were unavailable at the second trial or that Sosa had changed his testimony and was no longer a friendly witness to the

State. It was not error for the district court to allow the State to read into evidence testimony from the first trial.

*Prosecutorial Misconduct During Closing Argument*

During closing argument, the prosecutor stated:

"Remember that Alvin Mitchell has been approached by two males, one with a shotgun. He puts this defendant as the man with the shotgun, the black male. He is held up at gunpoint, the gun to his head, similar to Rigoberto Garcia, and his car, his wallet, his money, is demanded from him."

During his rebuttal argument, the prosecutor stated:

"He is the one that was shooting that gun. He is the one that used the gun. He is the one that put it in the same place on Alvin Mitchell's head that he put his pistol to the head of Mr. Garcia. The same one. That is what Sosa said."

Breedlove contends on appeal that these statements misrepresented the evidence, *i.e.*, there was no evidence in the record that Breedlove put a gun to Garcia's head.

Appellate review of an allegation of prosecutorial misconduct involving improper comments to the jury during closing arguments requires a two-step analysis. First, the appellate court decides whether the comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence. Second, if misconduct is found, the appellate court must determine whether the improper comments prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Bennington*, 293 Kan. 503, 530, 264 P.3d 440 (2011).

The record contains evidence showing that Breedlove indeed placed a gun to Garcia's head. Garcia was shot in the head at close range according to the forensic testimony. Sosa testified that he watched Breedlove shoot Garcia in the head while the two were wrestling for the gun. Whether Breedlove deliberately held the gun to Garcia's head or whether the gun ended up there in the course of the struggle is of minor significance; the prosecutor made the reasonable inference that Breedlove had held a gun to Garcia's head at close range, and the prosecutor's statements were within the scope of the latitude afforded him in commenting on the evidence.

### Violation of the Order in Limine

Prior to trial, the district court made a ruling in limine limiting certain evidence relating to Sosa's interaction with Breedlove. Breedlove argues that the State violated the order by presenting to the jury information regarding the putative kidnappings of Sosa committed by Breedlove on the night of the murder and several weeks after the murder.

Courts employ a two-part test to evaluate alleged violations of orders in limine: first, was there a violation of the order in limine, and second, if the order was violated, did the testimony substantially prejudice the defendant? Because the trial court is in the best position to decide whether its order in limine was violated, the denial of a motion for mistrial is reviewed under an abuse of discretion standard. *State v. Crum*, 286 Kan. 145, 160, 184 P.3d 222 (2008).

An order resulting from a motion in limine is a temporary protective order that is subject to change during the trial. *State v. Bloom*, 273 Kan. 291, 300, 44 P.3d 305 (2002); *State v. Quick*, 226 Kan. 308, 313, 597 P.2d 1108 (1979).

### A. *The State's Examination of Sosa*

When Sosa began to testify about the events of September 3, he explained that he and Breedlove traded crack cocaine for the car and that the police were investigating reports of a shooting in the neighborhood and suspected the car had been a target of the shooting. Upon hearing that testimony, the prosecutor approached the bench, suggested that Sosa had become a hostile witness, and asked for permission to read from the transcript of Sosa's testimony at the first trial. Breedlove's counsel did not object. The court declared Sosa to be a hostile witness and allowed the testimony regarding how Sosa ended up in the car on both days to be read to the jury as impeachment evidence. The State then went over the prior testimony with Sosa in detail, again without objection. When counsel finally did object, it was based on repetition rather than violation of the order in limine. The district court allowed the testimony to come in, noting that Sosa had been vague in his testimony about events during the second trial.

The question of the violation of the order in limine as it pertains to the questions to Sosa is not properly before the court. There was no contemporaneous, specific objection, and the district court clearly modified its order to allow the testimony.

B. *The Opening Statement*

Breedlove also contends the prosecutor violated the order in limine in his opening statements.

Appellate review of an allegation of prosecutorial misconduct involving improper comments to the jury during opening or closing argument to the jury requires a two-step analysis. First, the appellate court decides whether the remarks were outside the wide latitude that the prosecutor is allowed in discussing the evidence. Second, if misconduct is found, the appellate court must determine whether the improper remarks prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Miller*, 293 Kan. 535, 550, 264 P.3d 461 (2011).

During his opening statement, the prosecutor told the jury:

"Mr. Sosa started to run after Mr. Garcia went down. Mr. Breedlove got in Mr. Garcia's 1989 Sable and came back out of the driveway where Sosa was running back toward Pawnee and told Sosa to get in. Sosa hesitated, he pointed a gun at him. 'Get in.' So he got in. Took him home."

Reversing a conviction because of violations of motions in limine and prosecutorial misconduct requires a finding of prejudice to the defendant. Because the district court subsequently modified its order restricting the scope of direct examination and the evidence about Breedlove threatening Sosa came in, the opening statement was prejudicial: it made a one-phrase reference to facts that were later properly disclosed to the jury.

The State argues on appeal that this statement did not violate the court's order because the prosecutor did not actually tell the jury that Breedlove kidnapped Sosa. This argument is somewhat specious: clearly, the State suggested that the reason that Sosa got in the car with Breedlove was because Breedlove was pointing a gun at him, which appears to be kidnapping.

The State also argues that Breedlove did not preserve the issue on appeal because he failed to object to the opening statement.

This court, however, reviews a prosecutor's comments to a jury during the opening statement that are not in evidence even when no objection is lodged at the trial, although the absence of an objection may figure into the court's analysis of the alleged misconduct. *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009).

We nevertheless find no prejudice to Breedlove because the reference to the kidnapping was passing and because the district court later revised its order in limine.

### The Allen-*type Instruction*

Jury Instruction Number 12 read as follows:

"Like all cases, this is an important case. If you fail to reach a decision, that charge is left undecided for the time being. It is then up to the state to decide whether to resubmit the undecided charge to a different jury at a later time.

"This does not mean that those favoring any particular position should surrender their honest convictions as to the weight or effect of any evidence solely because of the opinions of other jurors or because of the importance of arriving at a decision.

"This does mean that you should give respectful consideration to each other's views and talk over any differences of opinion in a spirit of fairness and candor. If at all possible, you should resolve any differences and come to a common conclusion.

"You may be as leisurely in your deliberations as the occasion may require and take all the time you feel necessary."

Jury Instruction Number 1 read in part:

"Your only concern in this case is determining if the defendant is guilty or not guilty. The disposition of the case thereafter is a matter for determination by the Court."

Breedlove contends on appeal that these instructions are confusing, suggesting to the jury that it both should and should not concern itself with what happens after it concludes deliberations.

When a party objects to an instruction before the district court, this court considers whether the instructions as a whole properly and fairly stated the law as applied to the facts and whether they could have misled the jury. *State v. Duong*, 292 Kan. 824, 839, 257 P.3d 309 (2011). However, when a party does not make a timely and specific objection to an instruction, the standard of review is whether the instruction is clearly erroneous, which means that this

court must be convinced that there is a real possibility that the jury would have rendered a different verdict if the error had not occurred. 292 Kan. at 838-39.

Breedlove's counsel lodged a vague objection to the instruction:

"Well, I consistently ask the Court to not include the *Allen* instruction which is in instruction 12."

The State actually lodged a more specific objection:

"I do have an objection to number 12, Judge, that it's a modified-modified *Allen*. There was a recent case that came out—and I apologize I haven't been downstairs yet, but I know the Court is aware of what I'm talking about—that disapproves of any, that's the way I read it, disapproves of any *Allen* instruction."

The district court overruled the State's objection, contending that this court's opinions disapproving of *Allen*-type instructions have focused on language missing from the present instruction: "Another trial would be a burden on both sides." See, *e.g.*, *Duong*, 292 Kan. at 838 (focusing on those words in determining whether instruction was clearly erroneous). The State then agreed, albeit reluctantly, with the district court's decision to leave the *Allen* wording in the instructions.

In *Duong*, this court considered an objection that was similar in specificity to the one Breedlove's counsel lodged in the present case. The *Duong* court elected to apply a clearly erroneous standard and concluded that the instruction, including the "burden on both sides" language, was not clearly erroneous. 292 Kan. at 839. Because Breedlove's objection was not specific and because the offending instruction in his case places even less pressure on the jury than the *Duong* instruction, we find no error requiring reversal.

*Cumulative Error*

Under the cumulative error doctrine, this court determines whether the totality of the circumstances caused substantial prejudice to the defendant and denied him or her a fair trial. *State v. Edwards*, 291 Kan. 532, 553, 243 P.3d 683 (2010). Having found

no error of substance, we conclude that Breedlove did not suffer substantial prejudice that denied him his right to a fair trial.

Affirmed.