NOT DESIGNATED FOR PUBLICATION

No. 125,708

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ZEFERINO DIAZ,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; NEIL B. FOTH, judge. Submitted without oral argument. Opinion filed September 27, 2024. Affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, for appellant.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before GARDNER, P.J., GREEN and HILL, JJ.

PER CURIAM: Following a trial by jury, Zeferino Diaz was convicted of rape. On direct appeal, Diaz argues that the district court erroneously excluded evidence that would have shown that the alleged victim had a motive to falsify her allegations. He also contends that the State committed prosecutorial error in improperly vouching for the alleged victim's testimony. Finally, Diaz asserts that the cumulative effect of these errors prejudiced his right to a fair trial. For reasons stated later, we reject these arguments and affirm.

1

FACTS

Diaz appeals his conviction for the rape of his girlfriend's daughter, S.H., who was born in 2008. At a jury trial, the State presented evidence and argument that in August 2019 S.H. told her mother (Mother) of sexual acts by Diaz.

Diaz began dating Mother in 2016 or 2017. They moved into a home together in Olathe. Diaz brought along his three children and Mother brought S.H. In 2018, Diaz and Mother had a child together.

Mother testified that her relationship with Diaz was "rocky" in the period just before S.H. made the allegations, and the couple argued. Mother was not aware of anything inappropriate between S.H. and Diaz. S.H. "adored" her biological father, "but he wasn't around very much."

S.H. returned from a trip to her grandmother's home in July 2019. Mother discovered that S.H. had used her phone to communicate with boys. Mother confronted S.H., who was not truthful at first. Mother grounded S.H. and took the phone away. Diaz stood behind Mother's decision. Mother testified that S.H. was upset about losing her cell phone privileges.

In mid-August, S.H. had an emotional breakdown about not spending time with her biological father. Within a couple of days, Mother told S.H. that Diaz was offering to take S.H. out for ice cream. S.H. broke down and cried. Mother kept asking S.H. why she was upset. Mother testified that S.H. told her, "[W]hen you're gone he does nasty things to me . . . he humps me."

Mother testified that she asked S.H., "[D]o you know what humping is? She was like, yes. I'm not lying. I promise I'm telling you the truth." Mother asked, "[A]re you

sure [S.H.]? I wanted to make sure I was 100 percent clear. She was like, yeah." Mother further testified:

> "I froze. And then the next thing I thought was, oh my God, I wonder if he's doing that to his daughter as well. So I went to her and I asked her. I'm like, have you seen anything? Is everything okay? I didn't want her to know what was going on because I didn't want her to be upset. But she seemed like she was okay. She was like, no. I went back to [S.H.] and asked her again."

Mother walked outside, where Diaz was mowing the lawn, and confronted him about the allegation. At trial, S.H. testified, "[Mother] ran outside and confronted him. And I was called outside and it was—he kept denying it and saying it wasn't true. And I just—I just stood there because they kept—I was, like, uncomfortable to talk. It was too uncomfortable to talk."

Mother called S.H.'s paternal aunt (Aunt) and told her that Diaz had sexually touched S.H. Aunt insisted on taking S.H. to a hospital.

*Taking S.H. to the emergency room*

At a birthday party the next day, Mother told Diaz that S.H. was going to stay at Aunt's house for the night. Aunt and S.H. left, dropped Aunt's husband and children off at their home, and drove to the hospital. Aunt testified that on the way to the hospital S.H. broke down, stating, "[S]he was screaming crying to the top of her lungs." Aunt pulled over into a parking lot and consoled S.H.

Aunt testified that S.H. told her that Diaz had stuck his penis inside of her—that he had penetrated her. S.H. said that she was scared because she did not know how Mother would react. She said the allegations were true and that Mother did not believe her. S.H. clarified that she did not think that Mother would believe her.

3

S.H. told Aunt that the rapes happened on Sundays after Mother went to work but before Diaz went to play soccer. It typically occurred in the master bedroom. Diaz would "put his private area inside of her hole," and it hurt. S.H. said that it had been going on for years. It started months after moving into the Olathe home.

*Sexual assault examination*

That night at the hospital, medical professionals performed a sexual assault exam on S.H. The nurse found that the skin surrounding the vaginal opening had a purple discoloration. She also found a healing abrasion or tear, and purple discoloration, at the fossa navicularis.

The pediatrician reviewed the nurse's findings and then scheduled a second appointment with S.H. the following week. Patchy areas of red present during the first exam were gone by the second exam a week later. The doctor concluded that they had been injuries which had healed over the course of that week. The hymen had changed, which showed that it had been swollen at the first examination. The pediatrician testified that S.H.'s injuries "can only be caused if something penetrates into the vagina."

*Sunflower House interview*

At the Sunflower House, Shannon Bisel did a forensic interview of S.H. Mother and S.H.'s biological father were at Sunflower House but outside the interview room. S.H. told Bisel that she had to go to the hospital because Diaz did something bad to her. S.H. had been holding the information back for years. She was afraid she would get into trouble if she told.

S.H. told Bisel that the problems started happening a couple of months after moving into the Olathe residence. She was seven or eight years old at the time. She stated that Diaz raped her on more than one occasion.

*Rape in the bathroom*

S.H. told Bisel about one incident that occurred in the bathroom. S.H. was sleeping on the couch when Diaz woke her up and led her to the bathroom. Diaz removed S.H.'s clothes, picked her up, and placed her on the sink. S.H. said that she could see "his pee-pee."

Diaz spread S.H.'s legs and started "humping" her. When asked to define humping, S.H. explained that it meant, "putting his pee-pee inside of my vagina." S.H. told Bisel that it felt uncomfortable. S.H. stated that she told Diaz to stop, but he would not.

Afterwards, Diaz put his pants back on and S.H. sat on the toilet to urinate. Mother, needing to use the bathroom, walked in and noticed S.H.'s pants on the floor. She asked why her pants were off. S.H. wanted to tell her the truth, but Diaz interrupted and said S.H.'s pants kept falling off. S.H. told Bisel that this was not true because her pants fit well enough.

*Rape in the master bedroom*

S.H. told Bisel about Diaz raping her in the master bedroom. This would happen Sunday mornings after Mother left for work, but before Diaz's soccer game.

Diaz pushed S.H. onto the bed and made her lay on her back. He took off her underwear, and he pushed his pants and underwear down to his knees. He kept telling

S.H. to spread her legs and when she would start to close them, he would yank them back apart.

Diaz put his penis inside her vagina. S.H. stated that "it was painful and it hurted [*sic*] really bad and that's how I got injury [*sic*] down by my vagina." She told him to stop, but he would not. Diaz raped S.H. multiple times in the bedroom.

*Rape in the basement*

S.H. told Bisel about twice being raped on a bed in the basement. Diaz would take her pants off and make her lay on a bed.

*Telling Bisel about the trip to the hospital*

S.H. told Bisel that Aunt picked her up from the birthday party and took her to the hospital. Someone at the hospital told S.H. that she had an injury by her vagina. There was a shadow that turned out to be a bruise.

S.H. went for a second checkup a week later, which was the Monday before her interview at Sunflower House. The second checkup verified a vaginal injury and showed that it was healing. S.H. said Mother could not believe it, as Mother suspected S.H. may have been lying. S.H. told Bisel that each rape was painful. He would push it in her really hard. Afterwards, it would hurt when she urinated.

*Diaz did not want S.H. to talk about what happened*

At trial, Diaz' counsel questioned witnesses on an incident that occurred a month or two before S.H. made allegations. Counsel asked about the incident of Mother taking S.H.'s phone away from her for texting with a boy.

S.H. told Bisel that she tried to tell Mother the truth, but Diaz would not let her. Diaz told S.H. that, if she did not tell Mother, he would get her phone back. But she explained that she could not keep the information from Mother.

*Diaz' jail phone calls with Mother*

In investigating the case, Detective William King obtained recordings of jail phone calls between Mother and Diaz. In later phone calls, Diaz denied raping S.H. However, King testified in detail about the content of three phone calls which all occurred on September 17, 2019, immediately after Diaz was taken into custody.

In the 12:51 p.m. phone call on September 17, Mother asked if he had done anything to S.H. and Diaz responded, "I'm sorry. I'm very very sorry." Mother asked, "What are you saying you're sorry for, raping my daughter?" Diaz responded again, "I'm sorry, baby. I'm sorry." Mother asked one more time what he was sorry for and Diaz responded, "[F]or all these things you are asking me."

In the 2:52 p.m. call, Mother asked Diaz why he did it. Diaz responded, "I don't know . . . I don't know." She asked Diaz why he did not tell her before, and he stated that he was scared that she would call the police.

In the 4:45 p.m. call, Diaz apologized again, saying that he was hurt too. Mother asked Diaz if an apology would be enough to repair the damage, illustrating by asking him to imagine if she had sex with his son and then apologized. "Do you think 'sorry' is going to fix that? If I sat there and had sex with your son? Would that change it if I said I'm sorry? Would that change it for you?" Diaz said no, but never indicated in the conversation that he had not had sex with S.H. At one point, Mother directly confronted him by saying, "So you did it? You did it." Diaz only responded with, "I'm hurt too . . . ."

7

*Charges and trial*

The State charged Diaz with rape of a child under 14 years of age, in violation of K.S.A. 21-5503, and, in the alternative, aggravated indecent liberties with a child, in violation of K.S.A. 21-5506(b)(3). S.H. testified at trial, generally echoing the statements she previously made to Bisel during her Sunflower House interview. She testified to Diaz repeatedly raping her. S.H. testified that Diaz sometimes raped her in the bathroom, sometimes in the master bedroom, and sometimes on a bed in the basement.

S.H. testified that she was too scared to tell Mother at first. She explained the moment she decided to tell Mother as follows: "I was like—because I was, like, scared because she was going to leave me alone in the house with him and I didn't want—like, I couldn't hold it in anymore, so I just finally gave in and told her."

On cross-examination, Diaz' counsel asked Mother why she would believe S.H.'s rape allegations against Diaz. "So you're saying that after the trip to Illinois, after [S.H.] had developed a bit of an attitude, after she had her phone taken away, after there are other issues of her not being truthful that you took her for her word at that time?" Mother distinguished as follows: "I would say that's a serious manner. Kids don't lie about stuff like that. There's no benefit to her for that. And the way—if you could've seen her face and how much she was crying and look into her eyes you would understand."

Diaz denied the allegations, arguing that they were not credible or reliable. His counsel hypothesized that a young girl would make an allegation against her mother's boyfriend because she wanted to spend more time with her father and his relatives instead of living in a blended family with Diaz' children. After S.H. made the allegation, she went to live with Aunt. Diaz' counsel also addressed S.H.'s vaginal injuries by suggesting that there may have been sexual abuse from someone other than Diaz.

8

At trial, Diaz' counsel hypothesized that S.H. was angry about getting her cell phone taken away because she did something inappropriate while on vacation with her grandmother in Illinois. Counsel noted that Diaz was not the person who punished S.H., but stated, "Sometimes people are mad at one person, but they direct their frustration toward another." And finally, Diaz' counsel hypothesized that S.H. made rape allegations because she was angry that her biological father did not visit.

In closing argument, the State told the jury that in August 2019, S.H. "was able to make the disclosure." In rebuttal, the State declared, "We do know who did it because [S.H.] told you who did it."

The jury found Diaz guilty of rape. The district court sentenced Diaz to the presumptive period of life in prison without the possibility of parole for 25 years.

Diaz timely appeals.

ANALYSIS

I. *Did the district court err in excluding defense evidence?*

Diaz argues that the district court erroneously excluded evidence that the defense sought to present. The State argues that the district court correctly excluded irrelevant evidence and, if there was error, such error was harmless.

"The admission of evidence involves several legal considerations: determining relevance; identifying and applying legal principles including rules of evidence; and weighing prejudice against probative value." *State v. Levy*, 313 Kan. 232, 237, 485 P.3d 605 (2021). Appellate courts apply different standards of review depending on the consideration at issue.

First, a court must determine whether the evidence is relevant. All relevant evidence is admissible unless it is prohibited by statute, constitutional provision, or court decision. See K.S.A. 60-407(f); *Levy*, 313 Kan. at 237. Relevance is defined in K.S.A. 60-401(b) as "'evidence having any tendency in reason to prove any material fact.'" *Levy*, 313 Kan. at 237. Relevance has two elements: a materiality element and a probative element. 313 Kan. at 237.

"A material fact is one that has some real bearing on the decision in the case. Materiality presents a question of law that appellate courts consider de novo without deferring to the district court judge. [Citations omitted.]" *State v. Alfaro-Valleda*, 314 Kan. 526, 533, 502 P.3d 66 (2022). Evidence is probative if it tends to prove a material fact. 314 Kan. at 533. Appellate courts review the question of whether evidence is probative under an abuse of discretion standard. 314 Kan. at 533. Even if evidence is relevant, a district court has discretion to exclude it where the court finds its probative value is outweighed by its potential for producing undue prejudice. See K.S.A. 60-445. When an appellant questions the district court's weighing of probative value and prejudice, an appellate court reviews the ruling for an abuse of discretion. *Alfaro-Valleda*, 314 Kan. at 535.

A court's consideration of the admissibility of evidence can also require application of statutory rules controlling the admission and exclusion of certain types of evidence. Whether a particular legal principle or statutory rule governs the admission of particular evidence is a question of law subject to de novo review. See *State v. Miller*, 308 Kan. 1119, 1166, 427 P.3d 907 (2018). A principle or rule, however, is applied as a matter of law or as an exercise of the district court's discretion, depending on the applicable rule. 308 Kan. at 1166.

An appellate court exercises de novo review of a challenge to the adequacy of the legal basis of a district judge's decision on admission or exclusion of evidence. *State v.*

10

*Brown*, 307 Kan. 641, 644, 413 P.3d 783 (2018). An appellate court must apply the statutory law on evidence as it was at the time of the challenged evidentiary ruling, that is, at the time of the trial. *State v. Page*, 303 Kan. 548, 551-52, 363 P.3d 391 (2015).

The erroneous admission or exclusion of evidence is subject to review for harmless error under K.S.A. 2023 Supp. 60-261. *State v. Lowery*, 308 Kan. 1183, 1235-36, 427 P.3d 865 (2018). Nevertheless, if the error implicates a constitutional right, the effect of that error must be assessed under the constitutional harmless error standard. *State v. Thornton*, 312 Kan. 829, 832, 481 P.3d 1212 (2021) (applying constitutional harmless error standard to evidence obtained in violation of Fourth Amendment to the United States Constitution).

K.S.A. 60-404 generally precludes an appellate court from reviewing an evidentiary challenge absent a timely and specific objection made on the record. *State v. Ballou*, 310 Kan. 591, 613-14, 448 P.3d 479 (2019) (discussing K.S.A. 60-404 in detail).

As a procedural bar to appellate review, K.S.A. 60-404 requires a party to make a contemporaneous objection to issues involving the erroneous admission of evidence. *State v. Hillard*, 313 Kan. 830, 839, 491 P.3d 1223 (2021); see also *State v. Gaona*, 293 Kan. 930, 956, 270 P.3d 1165 (2012) (characterizing contemporaneous-objection rule as a "prudential rather than jurisdictional obstacle to appellate review"). Any pretrial objection to the admission of evidence must be preserved by contemporaneously objecting at trial, which can be accomplished through a standing objection. See *State v. Richard*, 300 Kan. 715, 721, 333 P.3d 179 (2014). Kansas appellate courts have, on occasion, refused to strictly apply the contemporaneous-objection rule in some contexts upon finding the underlying purpose for the rule has been satisfied. See, e.g., *State v. Hart*, 297 Kan. 494, 510-11, 301 P.3d 1279 (2013); *State v. Spagnola*, 295 Kan. 1098, 1103, 289 P.3d 68 (2012); *State v. Breedlove*, 295 Kan. 481, 490-91, 286 P.3d 1123 (2012).

A defendant who is tried solely on stipulated facts timely interposes an objection to the admission of evidence by filing a pretrial motion to suppress evidence and, in doing so, satisfies the requirements of K.S.A. 60-404 even if the defendant does not object to the evidence at trial. *State v. Kelly*, 295 Kan. 587, 594, 285 P.3d 1026 (2012).

A proper proffer of the substance of the evidence sought to be admitted is required for an appellate court to be in a position to review a challenge to its exclusion. See K.S.A. 60-405; *Hillard*, 313 Kan. at 839. But a formal offer of proof is not required when an adequate record—disclosing the evidence the party seeks to introduce—is made. *In re Acquisition of Property by Eminent Domain*, 299 Kan. 37, 42, 320 P.3d 955 (2014).

Whether an evidentiary ruling has violated the defendant's constitutional right to present a defense is subject to unlimited appellate review. The right to present a defense, however, is subject to evidentiary rules. *State v. Seacat*, 303 Kan. 622, 638-39, 366 P.3d 208 (2016).

The district court violates a criminal defendant's fundamental right to a fair trial if the court excluded relevant, admissible, and noncumulative evidence which is an integral part of the theory of the defense. But the right to present a defense "is subject to statutory rules and judicial interpretation of the rules of evidence and procedure." *State v. Banks*, 306 Kan. 854, 865, 397 P.3d 1195 (2017).

Diaz moved to admit evidence related to the victim's previous conduct. The district court held a hearing on the motion and Diaz explained the evidence he wanted to admit and argued its relevance. The district court found some evidence admissible but excluded other proffered evidence as not relevant.

The State argues that Diaz failed to preserve his argument. The State notes that K.S.A. 60-404 governs the admission of evidence while K.S.A. 60-405 governs the

exclusion of evidence. The State cites our Supreme Court's holding that an evidentiary challenge under K.S.A. 60-404 requires a timely and specific objection, which is not optional. *State v. Scheetz*, 318 Kan. 48, 59, 541 P.3d 79 (2024). The State argues that this court should extend this reasoning to K.S.A. 60-405 and require a timely and specific objection to the exclusion of evidence parallel to the requirement for admission of evidence.

The difficulty with the State's argument is defining what constitutes an objection. "If the district court knows of the specific grounds for an objection and has an opportunity to rule on it, then the purposes of the contemporaneous objection rule under K.S.A. 60-404 are fulfilled." *State v. Ross*, No. 125,604, 2024 WL 2991176, at *22 (Kan. App. 2024) (unpublished opinion) (citing *State v. Randle*, 311 Kan. 468, 480, 462 P.3d 624 [2020]). "Counsel does not need to use the words '"I object"' to comply with K.S.A. 60-404." *Ross*, 2024 WL 2991176, at *22 (citing *State v. Bowman*, 252 Kan. 883, 888, 850 P.2d 236 [1993]). Diaz moved to admit the evidence and spent an entire hearing arguing his justification. The district court heard the grounds for the objection and had an opportunity to rule on it. Diaz preserved his objection to the district court excluding evidence.

In Diaz' motion, he stated that Mother had taken S.H.'s cell phone away after S.H. sent a picture of herself in a sports bra to an older boy. Diaz sought to cross-examine witnesses about the fact that S.H. sent the photo, lied about it, and was punished for it. Diaz argued that these facts showed that S.H. had motive and incentive to falsify allegations.

At a hearing on the motion, the district court asked why Diaz cited K.S.A. 21-5502, commonly known as the rape shield law. See, e.g., *Samek v. State*, No. 124,307, 2022 WL 3135359 (Kan. App. 2022) (unpublished opinion). Diaz conceded that the photograph of S.H. in a sports bra might not fall under previous sexual conduct, protected

by K.S.A. 21-5502. But Diaz moved to admit testimony related to the photograph "to be cautious here and make sure that I am kind of playing by the rules to present this as a potential issue under the rape shield statute."

The State agreed that evidence of a complaining witness' motivation to fabricate would be relevant but disagreed that the precise cause of the trouble—the sent photograph—would be relevant. The State conceded that the photograph might not be sexual conduct under K.S.A. 21-5502, but the threshold question of relevancy remained.

The district court ruled that the evidence was not of sexual activity subject to K.S.A. 21-5502. The district court ruled that the defense could question S.H. about why Mother took her cell phone away, stating that "the path stops at you got in trouble for texting a boy or sending a picture of yourself to a boy and that is it." The district court told the defense, "That allows your—I guess your theory that this caused her great embarrassment without truly harassing or embarrassing this child witness who will testify in person, I assume."

At trial, Diaz presented evidence that S.H. got into trouble, leading Mother to take her cell phone away. Diaz elicited testimony from Mother that S.H. took her phone on her trip to visit her grandmother in Illinois. S.H. befriended a girl living there named Milana, who appears to have been a bad influence. When S.H. returned to Kansas, Mother called grandmother and told her that S.H. could no longer see Milana.

Diaz elicited testimony that Mother found out that S.H. was talking to a boy on her phone, which was not allowed. But Diaz did not ask a follow-up question about whether S.H. sent a picture of herself to a boy. When Mother confronted S.H. about texting a boy, S.H. lied. Mother took S.H.'s phone away because of her actions.

On appeal, Diaz argues that the district court erred in limiting the extent of cross-examination on the details of S.H. losing her phone privileges.

"The defense needed to elicit the embarrassing nature of S.H.'s act, of sending selfie photos wearing a bra to a boy, to show the emotion of being 'caught,' and the anger that could result in a false accusation. The court's allowed watered-down version, of having phone taken for texting, did not convey the full picture of events."

Diaz argues that the district court's ruling violated his right to present his defense, his right to a fair trial, and his right to confront his accuser. The exclusion of evidence that is an "integral part" of the theory of defense may violate the fundamental right to a fair trial. *State v. Walters*, 284 Kan. 1, 8, 159 P.3d 174 (2007). "A defendant is entitled to present his or her theory of defense. The exclusion of evidence that is an integral part of that theory violates a defendant's fundamental right to a fair trial." *State v. Maestas*, 298 Kan. 765, 781, 316 P.3d 724 (2014).

The district court ruled on Diaz' motion to admit evidence at the November 2021 hearing on the motion. As the State correctly notes, at that hearing, defense counsel asked further clarifying questions in preparation for trial. But closer to trial, defense counsel at the April 2022 pretrial conference asked "whether defense would be permitted to ask that one of the mother's concerns about those messages was that [S.H.] was . . . having messages with a boys [*sic*] or boys." After discussion with the State and the defense, the district court explained its ruling as follows:  "I think you can say she sent a picture of herself to the boy, but exactly what that picture looked like doesn't seem relevant at all." Despite direct permission from the district court to do so, Diaz did not draw out any testimony related to a picture.

First, the district court correctly ruled that the substance of the photograph was not relevant. Diaz' theory of the case was that S.H. fabricated accusations because her cell

15

phone privileges were suspended for texting a boy. The content of the photograph is not evidence which, under K.S.A. 60-401(b), has any tendency in reason to prove that she fabricated accusations against Diaz. In plain language, if she had sent a different photograph or texted different words and still lost cell phone privileges, it would have had no material effect on Diaz' theory of defense. The precise content of the photograph could have no real bearing on the jury's decision in the case.

Second, the record shows that the district court's ruling did not factually impact Diaz' theory of the case. The district court set an upper limit to the evidence that Diaz could present when it ruled, "I think you can say she sent a picture of herself to the boy, but exactly what that picture looked like doesn't seem relevant at all." But Diaz fell short even of that limit when his counsel asked Mother on cross-examination:

> "Q. And without getting into specifics, did you find out that she talked with boys through that phone?
> "A. Yes.
> "Q. And what did you do in response?
> "A. I took her phone.
> . . . .
> "Q. You'd agree that [Diaz] stood behind your decision to do that?
> "A. Yes.
> "Q. You'd agree with me as well that for [S.H.] having her phone she had had for all these months taken away from her was at least somewhat upsetting to her?
> "A. I'm sure it was a little bit, yeah."

Thus, Diaz presented less evidence of his theory of the case than the district court allowed. He complains on appeal that the district court's limits were too restrictive. But it was defense counsel, rather than the district court, which ultimately limited the evidence presented on this point. Because the district court did not prevent Diaz from presenting relevant evidence in support of his defense, we affirm Diaz' conviction.

16

II. *Did the prosecutor err during closing arguments?*

Diaz argues that the prosecutor improperly vouched for S.H.'s testimony and elicited sympathy for her as well. The State argues that Diaz complains of comments which were as neutral as possible and based on uncontroverted evidence. Because the comments fell within the wide latitude afforded to prosecutors, we affirm Diaz' conviction.

The appellate court uses a two-step process to evaluate claims of prosecutorial error:  error and prejudice. *State v. Sieg*, 315 Kan. 526, 535, 509 P.3d 535 (2022).

"To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

See also *State v. Fraire*, 312 Kan. 786, 791-92, 481 P.3d 129 (2021).

The statutory harmlessness test also applies to prosecutorial error, but when analyzing both constitutional and nonconstitutional error, appellate courts only need to address the higher standard of constitutional error. *State v. Carr*, 314 Kan 744, 764, 502 P.3d 511 (2022).

Appellate courts will review a prosecutorial error claim based on a prosecutor's comments made during voir dire, opening statement, or closing argument even without a timely objection, but the court may figure the presence or absence of an objection into its analysis of the alleged error. *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021).

"'[A] prosecutor's improper comment or argument can be prejudicial, even if the [error] was extemporaneous and made under the stress of rebutting arguments made by defense counsel.'" *State v. Roeder*, 300 Kan. 901, 934, 336 P.3d 831 (2014) (disavowing language in previous cases that defense provocation can justify prosecutorial misconduct); *State v. Sprague*, 303 Kan. 418, 429, 362 P.3d 828 (2015) (stating the "'open-the-door rule does not insulate a prosecutor from a finding of misconduct'" when responding to defense arguments). "Prosecutors may point out inconsistencies in a defendant's statements and argue the evidence reflecting poorly on the defendant's credibility. But in doing so, they may not accuse a defendant of lying. [Citation omitted.]" *State v. Liles*, 313 Kan. 772, 776, 490 P.3d 1206 (2021).

A prosecutor errs when arguing a fact or factual inference without an evidentiary foundation. *State v. Watson*, 313 Kan. 170, 179, 484 P.3d 877 (2021); see also *State v. Stimec*, 297 Kan. 126, 128, 298 P.3d 354 (2013) (prosecutor cannot comment on facts not in evidence to divert the jury's attention from its role as a fact-finder, or to make comments that serve no purpose other than to inflame the passions of the jury).

First, Diaz argues that the prosecutor erred when he told the jury that S.H. was ready to talk to Mother as follows:

> "It is not when it first started but it is when she was ready to tell her mom. In fact, there was such emotional—or emotional time or trauma within her that you heard [Mother] say, She just wouldn't stop crying, to the point where it was concerning to her. She kept

18

asking her, What is going on? Why are you crying? What happened? And she was able to make the disclosure."

Diaz argues that the prosecutor improperly vouched for S.H.'s credibility with the phrases "ready to tell her mom" and "was able to make the disclosure." But these phrases fall within the wide latitude afforded to prosecutors. The prosecutor stated no personal opinion about S.H.'s credibility and did not stray from what the evidence supported. S.H.'s testimony supported the idea that she was reluctant to tell Mother but eventually felt that she needed to tell her. The prosecutor's statements were a fair summation of the evidence. As the State correctly argues: "[T]he prosecutor did not elicit any more sympathy than what existed in S.H.'s own words." The State refrained from unnecessary editorializing and stayed within the confines of the evidence presented to the jury. These comments were not error.

Finally, Diaz argues that the prosecutor in rebuttal made an improper "we know" argument which also bolstered S.H.'s credibility. The State argues that the phrase "we know" is not always error and, in the context of rebuttal here, the phrase was within the wide latitude afforded to prosecutors.

"'We know' followed by a discussion of uncontroverted evidence is not prosecutorial error because no opinion is expressed." *State v. Coleman*, 318 Kan. 296, 306, 543 P.3d 61 (2024). The analysis of a prosecutor's "we know" statement is heavily context-dependent. *State v. Sweet*, No. 125,858, 2024 WL 2237413, at *12-14 (Kan. App. 2024) (unpublished opinion) (citing *Alfaro-Valleda*, 314 Kan. at 538-39, and *State v. King*, 308 Kan. 16, 417 P.3d 1073 [2018] in an extended discussion of the impact of context), *petition for rev. filed* June 17, 2024.

Diaz objects to a prosecutor's statement which, in context, is not error. During closing argument, defense counsel suggested that someone else may have raped S.H.

19

"Maybe something was going on. Maybe Chucho was hurting her. Maybe somebody else was hurting her." But no evidence suggested that another person had raped S.H. The State's rebuttal began as follows:

> "We do know who did it because [S.H.] told you who did it. If we want to make up people and invent evidence, then you should find him not guilty. If someone did it,—Chucho, homeless guys, someone at school, Malonia, maybe [Diaz and Mother's infant daughter] did it—yes, absolutely, I agree with [defense counsel], you should find him not guilty.
> "But we know who did it. She told you. They want to agree that sexual abuse happened? Well, then who did she say abused her? Mr. Diaz.
> "Arguments of counsel are not evidence. There is zero evidence that Chucho did anything. You can interpret the law enforcement response as defensive, or was it confusion about Why we are making suspects out of people where there is no evidence?"

The prosecutor's statements were clearly laying out the fact that no evidence pointed at any other suspect. In cross-examining S.H., defense counsel never questioned her identification of the person who raped her. The prosecutor's comments accurately represented that mistaken identity was never part of the case. The prosecutor asserted that if rapes happened at all, then it was Diaz who raped S.H., which accurately summarized the evidence presented. Because the prosecutor's "we know" statement preceded discussion of uncontroverted evidence, no prosecutorial error occurred.

III. *Did cumulative error deprive Diaz of a fair trial?*

Diaz argues that even if the exclusion of evidence and the prosecutor's comments were harmless error individually, then they had the cumulative effect of depriving him of a fair trial. Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when the totality of the circumstances establish that a defendant was substantially prejudiced and denied the right to a fair trial. If any of the errors being aggregated are constitutional in nature, the party benefitting from the error must establish

20

beyond a reasonable doubt that the cumulative effect did not affect the outcome. *Alfaro-Valleda*, 314 Kan. at 551-52.

The cumulative error rule does not apply if there are no errors or only a single error. *State v. Gallegos*, 313 Kan. 262, 277, 485 P.3d 622 (2021). Because Diaz fails to show error, the cumulative error doctrine does not apply.

For the preceding reasons, we affirm Diaz' conviction.

Affirmed.